# Meehan, Boyle, Black *&* Fitzgerald, p.c.
COUNSELLORS AT LAW
Two Center Plaza
Suite 600
Boston, Massachusetts 02108-1922

LEO V. BOYLE
PETER J. BLACK
WARREN F. FITZGERALD
JOHN CARROLL
MICHAEL B. BOGDANOW
KAREN R. RISTUBEN
BRADLEY M. HENRY
PETER J. AINSWORTH

TELEPHONE
(617) 523-8300
_____

FACSIMILE
(617) 523-0525
www.MBBF.com

Direct E-Mail:  BHenry@MBBF.com
Direct FAX No.:  (617) 523-0455

April 6, 2005

**VIA TELEFACSIMILE
and FIRST CLASS MAIL**

Harry A. Pierce, Esq.
Sloan and Walsh
Three Center Plaza
Boston, MA 02108

>   RE:   *Marlene V. Allen, Executrix of the Estate of James R. Allen, Ph.D.,
>   v. Massachusetts Bay Transportation Authority, National Railroad
>   Passenger Service (a/k/a "Amtrak") and CSX Transportation, Inc.*

Dear Harry:

I have finished a thorough review of the responses to the plaintiff's requests for production of documents to the defendant Massachusetts Bay Transportation Authority ("MBTA") and, as you once predicted, plaintiff finds that they are deficient in a number of respects.  Consequently, I write to see whether we can resolve or at least narrow some of the areas of dispute in anticipation of a possible motion to compel further responses and production from the MBTA.  Please consider this letter to be a request for consultation pursuant to Local Rules 7.1 and 37.1.

**WRITTEN RESPONSES PURSUANT TO RULE 34**

As a preliminary matter, Fed. R. Civ. P. 34 provides, in pertinent part, that a party who produces responsive documents shall produce them either "as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request."  In the MBTA responses, a large number of responses state, in essence, no more than "see documents produced" (e.g., Response Nos. 14, 26-30, 34-37, 39, 41-42, 52-53, 58 and 63) or "none, other than as produced" (e.g., Response Nos. 18, 24 and 64) and the like.

**EXHIBIT E**

Harry A. Pierce, Esq.
April 6, 2005
Page 2

Such unspecified responses which do not refer to specific documents and are not otherwise organized or labeled, make it impossible for the plaintiff to know what documents, if any, the defendant is producing in response to the categories of requested documents set forth in the requests.

## BLANKET OBJECTIONS

In preface, plaintiff states that the MBTA failed to serve responses to the plaintiff's document requests within thirty days, or within sixty days or within ninety days, all without seeking an extension and at a time when the plaintiff was repeatedly asking for such documents for use in scheduled depositions. In fact, it was not until plaintiff's counsel had drafted a motion to compel that the defendant finally served a response. It is therefore the plaintiff's position that any objections the defendant may have asserted had its responses been timely or had a proper extension been sought and granted, have been waived by defendant's failure to properly respond.

Nevertheless, to address the requests individually, in several instances the MBTA responded to a document request by merely reciting a blanket objection and then failing to offer any basis in support of the objection. For example (but only by way of example), in **Request No. 50**, plaintiff seeks incident or injury reports involving onboard illnesses or injuries starting five (5) years before the incident in this case. The MBTA's sole response is to object that the request "is not relevant, burdensome and oppressive ... [and further] ... seeks information which is privileged." The MBTA makes no attempt at all to suggest how incident reports from onboard illnesses are "irrelevant" when, after this incident, the MBTA itself determined that its commuter rail trains average between six and ten on board medical emergencies every week. We agree that the request is "not ... burdensome or oppressive," but suspect the MBTA actually intended to object that it was even though the MBTA made no effort at all to explain how or why the request is burdensome. Moreover, to state by rote that information sought is "privileged" with no attempt to explain what privilege applies, to what documents it applies, how it applies and to whom is simply scoffing at the rules of discovery. The same is true regarding the defendant's response to **Request No. 57** which seeks documents relating to MBTA training on AEDs that it already owns, a request clearly intended to discover the extent of knowledge and familiarity on the part of the MBTA regarding the devices. The defendant's entire response is: "The MBTA objects as not relevant, burdensome and oppressive." Such blanket objections are not in compliance with the MBTA's discovery obligations. (*See also*, **Response Nos. 38, 43, 51, 59, 63, 67, 69 and 70.**)

Similarly, in **Request No. 49** plaintiff sought incident or injury reports starting five (5) years before the date of the incident in this case in which persons suffered onboard illness or injuries, but for which medical assistance was specifically summoned. In this response, the MBTA does not object that the information sought is irrelevant; instead, it simply states that it is in some unspecified manner "privileged" and is somehow "overbroad in scope" with no attempt to either support or explain either objection. The response continues that "to respond ... would require review of many files and would take an inordinate amount of employee time." This is an

Harry A. Pierce, Esq.
April 6, 2005
Page 3

utterly inadequate objection to an obviously relevant document request.  By its very nature, discovery requires – indeed, the rules mandate – the review of "many files," often by employees who have other work to do.  The defendant has not objected that the request is "unduly burdensome" or "oppressive" and provided the factual basis for such objections; rather, the MBTA merely responds that complying with its discovery obligations would require the review of "many files" and require "inordinate ... employee time" with no attempt at all to quantify or explain any facts that support the objection. (*See also*, **Response Nos. 47 and 48**.)

The same is true of the MBTA's objection that **Request Nos. 47 and 48** would "require[] the defendant to determine what documents [in its possession, custody or control] constitute industry standards or trade practices which will be for the Court to determine."  How does the MBTA propose that the Court will determine this?  Representatives of the MBTA have already testified to that they belong to, and have participated in, various industry and trade organizations.  No doubt, there are other such organizations in which the defendant and its employees participate.  This information is known only to the defendant and only the defendant can determine whether it is in possession, custody or control of proposed or actual standards from such organizations that relate to the handling of onboard medical emergencies.  The  membership organizations to which the defendant and its employees belong, and which documents of those organizations the defendant possesses, is simply not information to which the plaintiff has reasonable access other than through discovery requests and which the court is in no position to "determine" until such time as the defendant properly responds to the requests.

As courts have repeatedly held, merely reciting an objection (e.g., "it's burdensome") does not satisfy the requirement for stating the reasons that support an objection (e.g., the documents requested are not searchable by computer, there are approximately 27,000 paper files that would require a minimum of 100 person-hours to review all with a good faith belief that, in any event, such a search will be futile.)  The reason for requiring such specificity in objecting is obvious; without such statements of reasons, the court and the requesting party are left to speculate as to the basis for the particular ground stated.  It is therefore the party resisting discovery that has the burden to clarify and explain its objections.  The MBTA has failed to do this in nearly every instance.

At this point, we ask that the defendant immediately undertake the necessary searches to locate and produce the documents requested by the Plaintiff's September 2004 requests within seven (7) days.  To the extent there are legitimate privileges of persons or entities other than the defendant at stake, then please provide a comprehensive privilege log as to those responses.

## **FAILURE TO PRODUCE DOCUMENTS**

In several instances the MBTA has failed to produce documents and/or has denied the existence of documents that plaintiff reasonably believes do, in fact, exist.  For example, **Request Nos. 3 and 4** request government filings or communications regarding the incident.  We are aware that MBTA officials reported to, communicated with and/or met several times with

Harry A. Pierce, Esq.
April 6, 2005
Page 4

representatives of the Federal Railroad Administration, with the Massachusetts Secretary of Transportation's office and with the MBTA Board, yet to our knowledge no documents that constitute or reflect such communications have been produced.  Likewise, in **Request No. 13**, the plaintiff requests the MBTA's written notices of breaches of contract to defendant Amtrak relating to the incident, notices of which we were specifically informed by MBTA representatives and which are required pursuant to the MBTA's Operating Agreement with Amtrak.  Yet, in **Response No. 13**, the MBTA claims that it "is unable to find any such documents." (*See also,* **Response No. 33** - post-incident bus and special transportation materials produced, but no pre-incident materials produced; **Response Nos. 9 and 64** - claim "none," yet plaintiff is aware of press releases, faxes and press contacts made by MBTA officials that have not been produced).  Such positions suggest a failure or unwillingness to undertake a reasonable search for responsive documents.  Clearly such documents exist, clearly they are relevant and clearly no privilege applies or has been asserted with respect to them.  Plaintiff's are entitled to their production immediately.

Also under this heading, in **Response No. 15** (applicable insurance policies) and **Response No. 56** (AED use in MBTA vehicles and facilities), the defendant has stated its agreement to produce responsive documents, yet we have not seen these documents to date.  Please provide these promised documents within seven (7) days.  Likewise, the defendant has stated that it "will supply" documents in response to **Request No. 65** (expert *curriculum vita*) and **Request No. 66** (materials from defense expert Robert Myerberg, M.D. which, again, counsel for the MBTA previously expressly agreed to produce, but did not), but only under Fed. R. Civ. P. 26(a)(2).  However, simply because another rule requires disclosure of the same or similar information or documents at a different time does not mean the defendant can simply ignore its discovery obligations under Rules 33 or 34.  As stated, the defendant has not stated valid objections to **Request Nos. 65 and 66** and plaintiff requests, once again, that the promised production be made withing seven (7) days.

Several responses that did reference a specific production of documents nevertheless appeared to be incomplete.  For example, while the MBTA's **Tab A to Response No. 1** included some documents (although not the TRA Final Report as stated which does not appear until **Tab K to Response No. 40**), it does not appear that the MBTA included any reports by management personnel to their supervisors (e.g., from Barry, Jones, Gallo, etc.)  It may be that no such documents exist, but it is not possible to determine this from the MBTA's responses.  The MBTA's **Tab B to Response No. 2** includes some documents but does not include others that are internally referenced therein (e.g., any response or related documents to the letter marked as Bates No. 284; copies of all relevant rules, policies and procedures and results if any to the MBTA's recommendation about Job Briefings referenced in the letter marked as Bates No. 285; Amtrak's reported review of the "Amtrak Emergency Preparedness Program" and training curriculum changes referenced in Bates No. 286.)  The MBTA's **Tab I to Response No. 31** includes portions of Amtrak's Training Course, but the two videos referenced at Bates No. 688 were not produced and the reference to the joint Amtrak/MBTA emergency drills and "MBTA Sponsored drills" conducted with "over one hundred local fire and police departments" seems to

contradict the MBTA's response to **Request No. 60**.

While **Tab J to Response No. 32** refers to MBTA "Safety Policy / Procedures Meeting[s]" on August 6, 2002 and September 4, 2002, no documents from these meetings appear to have been produced other than the meeting notice and an attendance sheet noting the participation of no fewer than fourteen senior MBTA officials, five Amtrak officials and two representatives from TRA. It is difficult to accept that all these officials attended such meetings but no notes, minutes, reports, e-mails, presentations, proposed policy or procedure modifications or other correspondence or written exchanges resulted. Even if that were the case, it is not possible from the MBTA's responses to confirm whether that was. Likewise, the MBTA Safety Department was to have instituted a program to evaluate contractor compliance with Medical Emergency Procedures and training, but we have been unable to find such documents in the MBTA's production. Similarly, while **Tab K to Response No. 40** contains some criticisms of emergency procedures relating to the incident itself, there appear to be no documents produced for the period of July 30, 1997 until the time of the incident. The MBTA's **Response No. 45** lists a "Draft TRA Final Report [dated] January 15, 2003" as attached at "Tab K," we can find no such draft in the production. I should note as well that we will also need new copies of **Appendix B to the TRA Report** (June 6, 2003 version; Bates Nos. 987 - 1086) because the copy in the production was truncated on the left side of the page rendering portions illegible.

In **Tab L to Response 44**, a letter from TRA dated June 12, 2003 suggests that a follow-up report "to show progress that has been made regarding the [TRA] recommendations" was under consideration but no such document appears in the production. It is not possible from the defendant's response to determine whether such a follow-up report was ever prepared. Also under **Tab L** is a letter dated August 27, 2002 (**Bates No. 1161**) refering to a "free site assessment" and enclosing to TRA materials from the company offering such services which were not produced. The production does not appear to contain any other documents relating to such a site assessment and it is not possible to determine from the responses whether it was ever conducted.

The memorandum of MBTA Police Chief Joseph C. Carter under **Tab L to Response 44** (**Bates No. 1162**) refers to AED funding issues and AED training on the part of the MBTA police department, yet the MBTA does not appear to have produced any other documents that describe or detail such funding issues or training. Likewise, an April 3, 2003 memorandum from Stephan Jones notes that "[F-S1] should be identical to that in the Train Dispatcher' (sic) Manual," but the manual itself does not appear to have been produced unless **Bates Nos. 1167 - 1170** ("OCC-SOP 5.0") constitute pages from that manual. Either way, no copies of such procedures that pre-date the incident in this case appear to have been produced. That same memorandum (last sentence on **Bates No. 1165**) indicates that "[interviews] with EMS providers indicate that five minutes is also the average response time to a train" but no notes, summaries, reports or other documents relating to such "interviews" appear to have been produced. Likewise, a series of SOPs for miscellaneous ground transit operation of the MBTA were produced, but all of those pertain only to SOPs that post-date the incident and there do not appear

Harry A. Pierce, Esq.
April 6, 2005
Page 6

to have been produced any copies of SOPs for such transit operations that pre-date the incident. With respect to documents gathered by the MBTA and TRA from other commuter lines surveyed during the review, the only document produced appears to have been one from Cal-Train. Based on the documents produced, it would appear that other commuter lines provided similar documents to the MBTA or its agent, TRA, and if so, those documents should be produced as well.

Similarly, the "MBTA Emergency Response Procedures Action Item List" (**Bates No. 1326**) indicates that a series of meetings took place in 2003, a "tracking system" was established by the MBTA Safety Department and lists and reports were generated. However, it is impossible to determine from the MBTA's responses whether any documents related to these events were generated. It does not appear, with the possible exception of a status report to the General Manager, that documents relating to these events were produced by the MBTA.

Only a single page, post-incident letter was produced under **Tab N of Response No. 54** dealing with AED use onboard MBTA commuter trains or at MBTA stations. While it is possible that there are no other responsive documents, that cannot be determined from the MBTA's responses. Given the federal government's and Amtrak's own "Operation Heartsaver" and the industry's consideration of AED use throughout the late 1990s, is it difficult to believe that no other responsive documents exist, especially in light of the MBTA's own pre-incident purchase, use and apparent training with AEDs. The same appears true of the MBTA's **Response No. 55** and the two documents produced at **Tab O** which disclose only post-incident AED materials and include none from the MBTA's prior purchase, use and training with AEDs.

## CLAIMS OF PRIVILEGE

The MBTA's invocation of unspecified privileges has been addressed above regarding **Response Nos. 49 and 50**. However, there remain unanswered questions as to the MBTA's assertion of a privilege in **Response Nos. 11 and 14** and the one page "Privilege Log" delivered with the responses. We first note that the MBTA has failed to specify or describe the nature of the privilege it asserts either in the responses or in its "privilege log." Nevertheless, it appears from the log that it might fall under the work product doctrine which is a qualified privilege that provides substantially less protection of documents than, say, the attorney-client privilege. It is notable that the "Investigation Report by Arthur J. Schultheiss Associates dated October 31, 2002" is an astonishing 108 pages long. While it is, of course, possible that the entire 108 pages constitute a single report prepared at the request of counsel, that would appear unlikely. If the report was accompanied by witness statements and that is the explanation for its size, the parties had already entered into an agreement to exchange all witness statements and that material

should be produced. If the report is accompanied by photographs or diagrams made at or near the time of the incident, then those photographs and diagrams are themselves discoverable.

If properly and timely asserted (which, plaintiff submits, it was not), the work product doctrine may protect from disclosure certain specific documents, but it does not protect factual

Case 1:04-cv-12080-PBS   Document 21-6   Filed 04/27/2005   Page 6 of 7

Harry A. Pierce, Esq.
April 6, 2005
Page 7

information contained in such documents.  If, for example, the withheld document contains the identities of witnesses to the incident or persons believed to have substantial discoverable information about the claims or defenses asserted in the case, then that information is not protected merely because it appears only in a document having qualified protection under the work product doctrine.  In any event, the MBTA would have an independent obligation to have disclosed that information under Fed. R. Civ. P. 26 and L.R. 26.2.  It is not possible to determine either from the defendant's responses or the "privilege log" the explanation for such a long investigation report being withheld unless there are documents attached to it that have not been separately identified.  In short, the information provided is insufficient for the plaintiff to determine whether the withholding should be contested.  We would therefore ask that you amend your **Response Nos. 11 and 14** and the "Privilege Log" to specify what, if any, documents are attached to or accompanied the Investigation Report and which "counsel" on behalf of the MBTA requested the report.

     I have tried to set forth the areas of dispute that I expect to raise in a motion to compel if they cannot be resolved.  I expect that some, perhaps many, of the issues can be resolved if the MBTA revisits its responses and production of documents and attempts in a timely manner to explain why certain documents were not produced and to locate and produce other documents that are clearly discoverable.

     Thank you for your attention to this matter.  I look forward to your response and to trying to resolve these issues.

     Very truly yours,


     Bradley M. Henry

c:    Amy M. Soisson, Esq.

@PFDesktop\::ODMA/MHODMA/IMANAGE;BOSLIB;105347;1