UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

MARLENE V. ALLEN, Executrix of the Estate
of James R. Allen, Ph.D.,

                           Plaintiff,

v.

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,
NATIONAL RAILROAD PASSENGER
SERVICE (a/k/a "AMTRAK") and CSX
TRANSPORTATION, INC.,

                           Defendants.

CIVIL ACTION
NO: 04-12080-PBS

**PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANT MASSACHUSETTS
BAY TRANSPORTATION AUTHORITY FOR SUMMARY JUDGMENT**

Plaintiff Marlene V. Allen, Executrix of the Estate of James R. Allen, Ph.D., hereby files

her opposition to the motion of defendant Massachusetts Bay Transportation Authority

("MBTA") for summary judgment.  As grounds for this opposition, plaintiff states that, assuming

*arguendo* that the MBTA did not waive the affirmative defense,[1] it has, in any event, failed to

satisfy its burden of proving that federal preemption under the Federal Railroad Safety Act

("FRSA") is applicable to the plaintiff's claims.

**BACKGROUND**

This case arises out of the July 30, 2002 death of plaintiff's decedent, James R. Allen,

Ph.D. ("Dr. Allen").  Dr. Allen suffered a cardiac arrest onboard an MBTA commuter train

which would not stop for medical assistance but, instead, continued to board and disembark

passengers at three station stops over a period of more than twenty minutes.  Substantially

---

[1]   The MBTA apparently concedes, as it must, that it failed to assert the necessary affirmative
defense of federal preemption in its Answer and raised the proposition of amending its Answer to assert
this defense for the first time only recently in a proposed but, as yet, unfiled motion to amend its Answer.
(*See* [MBTA's] Motion for Leave to File First Amended Answer and Crossclaim attached as **Exhibit A**.)

different from the MBTA's characterization of the plaintiff's allegations, the plaintiff has

actually asserted, *inter alia,* the following allegations:

1.      While on MBTA Train P514 (which was crewed by Amtrak personnel), "Dr. Allen began to gasp and make raspy, snore-like sounds drawing the attention of several passengers.  Within moments, Dr. Allen slumped sideways with his head and shoulders over the armrest into the aisle.  A nearby passenger immediately checked on him while another flagged down an Amtrak assistant conductor.  As the assistant conductor arrived, another passenger checked and found Dr. Allen's skin purplish and clammy." (*See* Complaint, p. 2 at ¶ 7, attached as **Exhibit B**).

2.      "A fellow passenger with a medical doctor's degree arrived ... asking the Amtrak personnel if 911 had yet been called, [and] at about 8:53 a.m., the doctor immediately began cardiopulmonary resuscitation  ...  Two Amtrak assistant conductors were present when it was clearly stated that Dr. Allen had no pulse, was not breathing and was, therefore, critically ill." (**Exhibit B**, Complaint, p. 2 at ¶ 8; Deposition of Jeanne E. Hathaway, M.D., pp. 33-34 attached as **Exhibit C**).

3.      "CPR was ongoing when the train pulled into Auburndale station ... at about 8:54 a.m. ...  More than one passenger offered to call 911 for the crew, but were told: 'we've got it.'  As commuters boarded at Auburndale, the crew decided that the train would proceed to Back Bay located four stations, and nearly twenty minutes, away." (**Exhibit B**, Complaint, p. 2 at ¶ 9; Deposition of James A. Peros, pp. 38-39, attached as **Exhibit D;** Witness Statement of Dale H. Boam, p. 3 attached as **Exhibit E**).

4.      "Newton-Wellesley Hospital ... is located one mile from the Auburndale station and is about one minute away by ambulance.  Newton Fire Station No. 2 is located less than six-tenths of a mile, or about forty-five seconds for an emergency vehicle, from the Auburndale station.  Like all ambulances regularly serving NWH ... every Newton Fire Department emergency vehicle contained portable external defibrillation equipment.  Between 8:40 a.m. and 9:05 a.m., rescue vehicles and personnel were in quarters ... and were available to respond if called.  Despite this, Train P514 departed Auburndale at about 8:56 a.m." (**Exhibit B**, Complaint, p. 2 at ¶ 10).

5.      "It was not until the train was stopped at Auburndale that Amtrak's lead conductor arrived at the scene to evaluate the emergency.[2]  When challenged by passengers as to why they were not awaiting medical assistance, the conductor

---

[2]   In fact, through discovery it has since been learned that even though he was aware of the emergency at or before Auburndale, in violation of all safety and emergency regulations including the Emergency Preparedness Plan upon which the MBTA bases its motion, the conductor actually did not show up to evaluate the emergency for himself until much later, either at or shortly before the West Newton Station. (*See* **Exhibit D**, Depo. of J. Peros, pp. 15-20, 39).

inaccurately stated that emergency personnel could not access the station ...  As the train departed Auburndale, the crew had still made no attempt to contact emergency medical services or to even report the situation as an emergency ...” (**Exhibit B**, Complaint, pp. 2-3 at ¶ 11).

6.       “As Train P514 proceeded on its usual schedule from Auburndale to West Newton, Amtrak’s lead conductor was observed casually collecting tickets from seat-backs.  It was not until the train slowed for its scheduled stop at West Newton, minutes later, that the engineer reached CSX dispatch in Albany, New York, to advise, incorrectly, that: ‘Our conductor’s got a passenger who has apparently passed out, he’s breathing, but passed out.  We need medical attention at Back Bay station.’  ... Neither the conductor nor the engineer declared an emergency as provided for under all standard railroad operating rules or under the operating rules of either the MBTA or Amtrak.  The train crew made no attempt to make direct, local contact with Amtrak, the MBTA, EMS or 911.” (**Exhibit B**, Complaint, p. 3 at ¶ 12).

7.       “As Train P514 slowed to a stop at West Newton, another passenger challenged the lead conductor and demanded to know why, if they had to proceed to Back Bay, they were still stopping for passengers instead of going straight through.  The conductor responded, ‘What about the people on the platform?’ and dismissed the passenger, telling him to ‘take it up with the T.’  Passengers looked on in disbelief as the crew made yet another routine stop to disembark and board commuters.  Many on board began yelling at the crew to do something.” (**Exhibit B**, Complaint, p. 3 at ¶ 14; Witness Statement of Kirsten N. Hano, pp. 2-3 attached as **Exhibit F**).

8.       “Newton Police Headquarters is located about two hundred yards from the MBTA’s West Newton commuter rail station.  A portable, Automated External Defibrillator (‘AED’) was available in or near the Police Station’s front lobby.  All Newton police vehicles were equipped with AEDs.  ... Despite this, Train P514 pulled out of West Newton at 9:00:41 a.m.” (**Exhibit B**, Complaint, p. 3 at ¶ 15).

9.       “Within about thirty seconds after departing West Newton, a young man trained as an ... EMT ... arrived to assist in providing CPR to Dr. Allen.  The young man urgently instructed the crew to call ahead and have paramedics waiting at Newtonville, the next stop, but when the conductor responded that they could not and that it would somehow be faster to have paramedics waiting at Back Bay, the young man told him to make certain they were routed express.  None of these instructions were heeded.” (**Exhibit B**, Complaint, p. 3 at ¶ 16; **Exhibit E,** Statement of D. Boam, pp. 7-8).

10.      “Shortly after the train departed West Newton, another concerned passenger followed a male crew member through a car demanding to know what they were doing and seeking assurances that, if they had to proceed to Back Bay, the train would make no further stops en route.  When the conductor asked the passenger why, the man explained in disbelief the seriousness of Dr. Allen’s medical situation and that he

would die if the crew continued to stop for passengers.  The conductor promised that no more stops would be made.  The train then made yet another routine stop for passengers at the Newtonville station at 9:02:39 a.m." (**Exhibit B**, Complaint, p. 4 at ¶ 17; Witness Statement of Jennifer L. Houghton, pp. 2-3 attached as **Exhibit G**).

11.     "Newton Fire Station No. 4 is located less than one-half mile from the Newtonville station and is staffed with rescue personnel and paramedics who were in quarters at 9:00 a.m. on July 30, 2002.  Travel time from the firehouse to the MBTA's Newtonville station is approximately 45 seconds." (**Exhibit B,** Complaint, p. 4 at ¶ 18).

12.     "At about 9:15 a.m., Train P514 pulled into Back Bay station.  ...  James Allen was declared dead at 10:14 a.m." (**Exhibit B,** Complaint, p. 4 at ¶ 19).

13.     "At the time of Dr. Allen's collapse and cardiopulmonary resuscitation, it was or should have been clear to the train's crew that Dr. Allen needed emergency medical services, including defibrillation and advanced life support, and that such services were readily available near the three rail stations at which the train stopped immediately after Dr. Allen's collapse.  As a result of the gross negligence, recklessness and unfair acts and practices of the defendants, the crew failed to immediately contact emergency services, failed to report the emergency in a timely manner, and failed to access available emergency services at various stops along the route.  Had the defendants satisfied their duty of care to Dr. Allen, he would have recovered from this incident and resumed his regular activities; instead, the decedent died as a result of the negligence, gross negligence and violations of Mass. Gen. L. c. 93A on the part of the defendants, their employees and agents." (**Exhibit B,** Complaint, p. 4 at ¶ 20).

14.     "The defendants, their employees and agents were negligent on, and prior to, July 30, 2002 with respect to the operation of the MBTA commuter rail system by, among other things, failing to take reasonable steps in response to Dr. Allen's need for emergency services, failing to have and follow adequate emergency and communications procedures and failing to properly train their personnel." (**Exhibit B,** Complaint, p. 5 at ¶ 23).

15.     "The defendants violated the Massachusetts Consumer Protection Act, Mass. Gen. L. c. 93A, with respect to the operation, control and provision of services on and for the MBTA commuter rail system on, and prior to July 30, 2002, by, among other things, violating safety rules and regulations intended to protect consumers and failing to develop, institute and implement proper emergency medical procedures and preparedness training." (**Exhibit B,** Complaint, p. 6, ¶ 31).

These are the allegations which the plaintiff actually made.  Despite such allegations, the

MBTA contends that regulations under the FRSA preempt these claims as a matter of law.  On

the contrary, the MBTA has not only failed to satisfy its burden of proof on this affirmative

defense, but it has also failed to satisfy any of the requirements necessary for the application of

federal preemption.

### ARGUMENT

I.     FRSA's Preemption Clause Displays Considerable Solicitude for State Law,
       And Is Only Applicable In Very Narrow Circumstances When the Federal
       Regulations Substantially Subsume the Subject Matter of the Particular Claim.

Contrary to the MBTA's contention that the FRSA's "regulations involving passenger

safety and emergencies are promulgated and enforced to the exclusion of state law" (Defendant's

Memo., p. 2), only in very narrow circumstances are common law tort claims subject to federal

preemption under the FRSA.  In addressing the issue of FRSA preemption, the Supreme Court

began with the basic premise that, in "the interest of avoiding unintended encroachment on the

authority of the States ... a court interpreting a federal statute pertaining to a subject traditionally

governed by state law will be reluctant to find pre-emption." *CSX Transportation, Inc. v.*

*Easterwood*, 507 U.S. 658, 664-65, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). As to the specific

issue of the preemptive effect of regulations issued pursuant to the FRSA, the FRSA's

preemption clause "displays considerable solicitude for state law" and preemption will lie only if

the federal regulations "substantially subsume the subject matter of the relevant state law." *CSX*

*Transportation, Inc. v. Easterwood*, 507 U.S. at 664-65. This is because "there is a strong

presumption against preemption," and even moreso "if preemption would deny an injured party

all judicial remedies." *Gollihue v. Consolidated Rail Corp.*, 120 Ohio App.3d 378, 697 N.E.2d

1109 (1997) (denying defendant's assertion of preemption defense under FRSA).

The FRSA provides that a "State may adopt or continue in force a law ... related to

railroad safety until the Secretary of Transportation prescribes a regulation or issues an order

*covering* the subject matter of the State requirement." 49 U.S.C. § 20106 (emphasis supplied).

The Supreme Court's very narrow view of the circumstances in which FRSA regulations preempt state law claims is based in part on the statutory term "covering," which requires the defendant to "establish more than that they 'touch upon' or 'relate to' that subject matter ... for 'covering' is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *CSX Transportation, Inc. v. Easterwood*, 507 U.S. at 664.

     *Easterwood* and its progeny have taken a uniformly narrow view of the circumstances in which federal regulations can be viewed as "covering" the subject matter of a plaintiff's tort claim. In *Easterwood*, the Court stated that, in light of "the presumption against pre-emption, and given that the regulations provide no affirmative indication of their effect on negligence law, we are not prepared to find pre-emption solely on the strength of the general mandates of 23 CFR pt. 924." *CSX Transportation, Inc. v. Easterwood*, 507 U.S. at 667-668. After *Easterwood*, and based upon its very narrow view of the circumstances in which preemption is permitted under the FRSA, other courts have routinely rejected requests to preempt common law tort claims. For example, in *United Transp. Union v. Foster,* 205 F.3d 851, 860 (5th Cir. 2000) (citations omitted), the court reiterated its view that "'FRSA preemption is even more disfavored than preemption generally.' ... When applying FRSA preemption, the Court eschews broad categories such as 'railroad safety', focusing instead on the specific subject matter contained in the federal regulation. ... In sum, when deciding whether the FRSA preempts state laws designed to improve railroad safety, we interpret the relevant federal regulations narrowly to ensure that the careful balance that Congress has struck between state and federal regulatory authority is not improperly disrupted in favor of the federal government."

The *United Transp. Union v. Foster* court recognized that "regulations promulgated pursuant to the FRSA require all lead locomotives to be equipped with audible warning devices with a specified minimum decibel level. ... Appellees invite us to hold that by issuing regulations covering audible warning equipment, the Secretary intended to bar states from regulating the manner in which such signals are sounded. We respectfully decline this invitation. ... Although the Secretary has issued regulations covering the sound capacity of audible signaling devices, we find that these regulations neither 'cover' nor 'substantially subsume' regulations governing when such devices are sounded. ... A sound capacity safety regulation does not subsume regulations on when whistles are sounded." *Id*., 205 F.3d at 861-862 (footnotes and citations omitted).

Similarly, in *Libel v. Union Pacific R.R.*, 109 P.3d 730 (Kan. App. 2005), the court rejected the defendant's assertion of a federal preemption defense to claims of a "duty to warn" about dangerous conditions at a railroad crossing. The court relied in part on the case of *Pearson v. Columbus and Greenville Ry.*, 737 So.2d 390 (Miss.App.1998), in which

> a motorist brought an action against a railway company after having run into a freight car ... at a crossing. ... the claim that the crossing was unreasonably dangerous was preempted by the federal law, but the claim that the railway breached its duty to make its rail cars conspicuous was not. The court observed: "There is evidence that no decision was made to set uniform standards for reflectors. For preemption, what is needed is proof in some form that the agency concluded 'that no such [state] regulation is appropriate....'. ... It is when the agency molds inclinations and evidence into a determination that safety would not be enhanced that states become barred from regulating the subject. ... negligence suits involving railroad-automobile accidents are not as a category of case preempted."

*Libel v. Union Pacific R.R.*, 109 P.3d 730, 732 (citations omitted).

The court in *Strozyk v. Norfolk Southern Corp.*, 358 F.3d 268 (3rd Cir. 2004) also took a narrow view of the scope of preemption under the FRSA. The court recognized that although a

superficial view of the *dicta* in *Easterwood* could imply preemption in railroad cases, "these

passages should not be read out of context. Read in their totality, neither opinion speaks of

supplanting the negligence regime of the fifty states ... Instead, the Supreme Court recognized

that 'the scheme of [state] negligence liability could just as easily complement' the basic division

of state and federal responsibilities." *Strozyk*, 358 F.3d at 275, citing *Easterwood*, 507 U.S. at

668. The *Strozyk* court then concluded that claims of inadequate visibility were not preempted:

> The plain language of the regulation indicates that the subject matter is the
> adequacy of warning devices, not the considerations involved in choosing them or
> state negligence law more broadly. The regulations provide that '[a]dequate
> warning devices ... are to include automatic gates with flashing light signals when
> one or more of the following conditions exist....' The bare mention of these
> conditions, including limited visibility, does not indicate an intent to regulate
> those conditions. By this reasoning, each of the listed considerations, e.g.,
> schoolbus traffic, high speed trains, or trucks freighted with hazardous materials,
> would be the subject matter of the regulation. The plain meaning of the regulation
> defies such an expansive reading.  To be certain, the regulations before us do
> involve the issue of limited sight distance. But the Supreme Court has cautioned
> that a showing that certain FRSA regulations preempt state law requires 'more
> than that they 'touch upon' or 'relate to' that subject matter.... *Easterwood*, 507
> U.S. at 664, 113 S.Ct. 1732. For preemption to be found, the regulation must
> 'substantially subsume[ ]' a subject area of state law. Id. The mere listing of
> various conditions that would require active warning devices as a matter of federal
> law does not constitute substantial subsumption requiring the displacement of
> related state law.

*Strozyk*, 358 F.3d at 273. *Accord, Clark v. Illinois Central Railroad Co.,* 794 So. 2d 191, 195

(Miss. 2001) ("obstructed view" claims are not preempted by the FRSA, as principles "of

federalism operate with particular force to preserve traditional spheres of state law"); *Shanklin v.*

*Norfolk Southern Railway Co.,* 369 F.3d 978, 986 (6th Cir. 2004) (claims were not preempted

because, although federal regulations relate to or touch upon vegetational growth, they do not

"cover" in the sense of "substantially subsume" claims of negligence resulting from excessive

vegetation near tracks).

In light of the strong presumption against federal preemption under the FRSA, and applying the principles addressed in the cases described above, the MBTA has not satisfied its burden of proving this affirmative defense.

> II.    Assuming *Arguendo* That The Preemption Defense
>        Has Not Been Waived, the MBTA Has Not Sustained
>        Its Burden of Proof On This Affirmative Defense.

> A.    The MBTA Failed To Assert The Federal Preemption Defense in it Answer.

Under Fed. R. Civ. P. 8(c), the MBTA was required to plead all affirmative defenses. Its failure to assert the so-called federal preemption defense constitutes a waiver of its right to assert it at this stage of the proceedings. *Wolf v. Reliance Std. Life Ins. Co.*, 71 F.3d 444, 448 (1st Cir. 1995) (ERISA preemption waived if not pleaded as affirmative defense); *Castro v. Chicago Housing Authority*, 360 F.3d 721, 735 (7th Cir. 2004); *Rehab. Inst. v. Equitable Life Assur. Soc'y of the U.S.*, 937 F.2d 598 (3d Cir.1991).

When, as in the present motion, the federal preemption argument relates to the question of whether federal or state law is applicable, rather than the question of whether the court has jurisdiction, the defense is waivable. *Sweeney v. Westvaco Co.*, 926 F.2d 29 (1st Cir. 1991). In *Sweeney*, the First Circuit Court of Appeals, followed "the weight of court of appeals authority," such as the decision of the Ninth Circuit, in *Johnson v. Armored Transport of California, Inc.*, 813 F.2d 1041 (9th Cir. 1987), which "concluded that § 301 pre-emption (in the Supreme Court's terminology) was a matter of what law ought not to apply (namely, federal collective-bargaining-agreement law or state tort law) rather than of what forum ought (or ought not) to apply it. Consequently, it held that the parties could waive the defense..." *Sweeney*, 926 F.2d at 39. Similarly, in *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1266 (9th Cir. 1996), a litigant attempted to raise federal preemption for the first time on appeal. The court recognized

that the underlying argument - seeking the application of federal rather than state law - was "a

choice of law claim to avoid liability, rather than a choice-of-forum claim" and held that it had

been waived by the appellant.

The MBTA failed to raise federal preemption in its answer. (*See* **Exhibit A**, MBTA's

recently proposed (but not filed) Motion to Amend its Answer, p. 3).  The plaintiff did not

contest the defendants' removal of this case to federal court, and the jurisdiction of this court (a

non-waivable defense) is not in question. Instead, the MBTA seeks to avoid liability by

contending that Massachusetts law is preempted by federal law. Such a contention involves

choice of law, and can be waived by a litigant. The MBTA's argument is not only incorrect (as

discussed below), but has been waived by its failure to assert it as an affirmative defense.

Therefore, its motion should be denied for this reason alone.

       B.        The Statutory Provisions and Regulations Relied upon by the MBTA Do Not
                "Substantially Subsume" the Subject Matter of the Plaintiffs' Claims.

Applying the principles of *Easterwood* and its progeny, it is clear that, even if it did not

waive this defense, the MBTA has failed to rebut the strong presumption against federal

preemption under the FRSA.  The regulations raised by the MBTA are similar to those addressed

in *Easterwood* and the other cases cited above.  Like the provision addressed in *Easterwood*, the

so-called "preemption" provision relied upon by the MBTA only applies when it is found to have

been "covering the same subject matter" as the subject claims. 49 C.F.R. § 239.5.  Moreover, it

simply "prescribes minimum Federal safety standards for the preparation, adoption, and

implementation of emergency preparedness plans" and "does not restrict railroads from adopting

and enforcing additional or more stringent requirements not inconsistent with this part." 49

C.F.R. § 239.1.

The regulations at issue are set forth in 49 C.F.R. § 239.101.  Both as to specificity and the degree to which they "cover" the handling of an emergency like Dr. Allen's, they are entirely unlike the "miles per hour" speed limits which have resulted in federal preemption.  Thus, while the MBTA is not incorrect in arguing that "specificity" of the regulations is one of the factors to be considered by the court, and that the FRSA regulations "governing the speed of trains preempted local regulation of speed" (Defendant's Memo., p. 4), it cannot be seriously argued that the FRSA regulations "substantially subsume" the subject matter of the claim that James Allen would be alive today if the train and its crew had allowed him access to emergency personnel and equipment that were readily accessible at each stop. (*See* pp. 2-4 above.)  At most, the regulations "relate to" the handling of an emergency - for the most part, an emergency involving a crash - but they certainly do not come close to "covering" and "substantially subsuming" the negligent conduct alleged by the plaintiff in this case.  They do not substantially subsume the claim that Dr. Allen should have been permitted to be disembarked because emergency treatment was just seconds away at each of the three stops that took place while James Allen was being given CPR.  They do not substantially subsume the claim that James Allen should have been taken off the train to receive such treatment, or that personnel should have been contacted and permitted to enter the train to provide defibrillation.  They provide for minimum equipment on certain types of trains, but do "not restrict railroads from adopting and enforcing additional or more stringent requirements" and therefore do not "substantially subsume" the claim that necessary defibrillation equipment should have been on board the train.  49 C.F.R. § 239.1.  The regulations provide certain training requirements and communication requirements, but do not address, and certainly do not "substantially subsume," training and

communication in the event of a cardiac arrest or other similar medical emergency involving a

passenger.

Regulations covering the sound capacity of audible signaling devices did not preempt

claims involving when such devices are sounded, *United Transp. Union,* 205 F.3d at 861-862;

regulations involving limited visibility at crossings requiring adequate warning devices do not

preempt limited visibility claims, *Strozyk,* 358 F.3d at 273; regulations relating to vegetational

growth do not preempt claims of excessive vegetation near tracks, *Shanklin,* 369 F.3d at 986.

The very general regulations involving emergencies, primarily crashes, barely even address, and

certainly do not "substantially subsume" the conduct necessary when a passenger has a cardiac

arrest on board a train. The MBTA has simply failed to satisfy its burden of establishing the

affirmative defense of federal preemption in the present case.

C.      The MBTA's "Passenger Train Emergency Preparedness Plan" Does Not
        "Substantially Subsume" the Subject Matter of the Plaintiffs' Claims.

The MBTA also contends that its own "Passenger Train Emergency Preparedness Plan"

("the Plan") federally preempts the plaintiff's tort claims.  First, there are genuine issues of

material fact as to whether this plan was, in fact, in effect, and whether the MBTA had even

shared the plan with Amtrak, the entity responsible for the train's operation at the time at issue.

1.      The MBTA has not satisfied its burden of establishing that the plan
        was in effect, or that the MBTA had even shared the plan with Amtrak,
        the entity responsible for the train's operation at the time in question.

Despite the MBTA's heavy reliance on its claim that it had a Passenger Train Emergency

Preparedness Plan in effect with the FRA under 49 C.F.R. § 239, the MBTA has repeatedly failed

or refused to produce any of the documentation specifically required under 49 C.F.R. § 239.201

showing that MBTA Plan was ever, in fact, filed with, and approved by, the FRA. (*See* MBTA's

Response No. 43 to Documents Requests attached as **Exhibit H**; MBTA's Supplemental

Response No. 43 attached as **Exhibit I**).  Section 239.201 provides, in pertinent part, that:

> "(a) ...  Each passenger railroad to which this part applies and all railroads hosting its passenger train service (if applicable) shall jointly adopt a single emergency preparedness plan for that service and the passenger railroad shall file one copy of that plan with the [FRA].
>
> (b) ... (1)  Preliminary review.  "[the] FRA will conduct a preliminary review of the proposed plan ... [and] ... will then notify the primary contact person of each affected railroad *in writing* of the results of the review ...
>
> ... (2)  Final review.  ... "[the] FRA will conduct a comprehensive review of the conditionally approved plan ... [and] ... will then notify the primary contact person of each affected railroad *in writing* of the results of the review, whether the conditionally approved plan has been finally approved by FRA, and if not approved, the specific points in which the plan is deficient." (emphasis supplied)

While the regulations upon which the MBTA relies specifically call for written approvals

of the plans submitted, despite plaintiff's repeated requests and a Court Order that the MBTA

produce such relevant documents, the MBTA has failed or refused to produce *any* documentation

between it and the FRA showing that its plan has ever been filed, much less approved.  Even

though this is an element of proof that, on summary judgment, rests squarely with the movant,

the MBTA's only response is "that's how they [at the FRA] do it." (*See* Rule 30(b)(6) Deposition

of MBTA by Anna M. Barry, pp. 165-168 attached as **Exhibit J**).  Be that as it may, the MBTA

has failed in its burden to show in its motion or other submissions that it is in compliance with

the filing and approval requirements of § 239, much less the safety provisions of that section.[3]

---

[3] It is worth noting that, according to recent testimony by the MBTA's "Director of *Railroad* Operations," the "MBTA *Commuter Rail Service*" is now claiming that it is not actually even a "railroad" since it had a contract with Amtrak to operate the service. (*See* **Exhibit J**, Rule 30(b)(6) Depo. of MBTA by A. Barry, pp. 32-39).  Such a position is specious given that § 239.7 specifically defines "Railroad" as "(1) (i) Commuter or other short-haul passenger service in a metropolitan or suburban area ... and (2) A person that provides railroad transportation, whether directly or by contracting out operation of the railroad to another person."  Nevertheless, given the MBTA's claim that it is not a "railroad," it is difficult to understand why it filed any emergency preparedness plan in the first place since only

Moreover, as set forth above, the regulations specifically require that "each passenger railroad ... and all railroads hosting its passenger train service (if applicable) shall *jointly adopt a single emergency preparedness plan* ... and the *passenger railroad shall file one copy of that plan* with the [FRA]." 49 C.F.R. § 239.201(a). (emphasis supplied).   Under the applicable C.F.R.s, the MBTA was the "passenger railroad" and the "railroad hosting its passenger train service" was CSX, the freight railroad over whose rails MBTA Train P514 was operating on June 30, 2002. *See* 49 C.F.R. §§ 239.101 (a)(iii)(D) and 239.101(a)(3). (*See also*, Deposition of Amtrak by Larry R. Beard, Director - Office of Emergency Preparedness, pp. 25, 43-47, 53-58 attached as **Exhibit M**).

 Section § 239.201(a) therefore mandated that the MBTA file a single *jointly adopted* plan such as, for example, the Joint Plan between Amtrak and CSX for Amtrak's own intercity passenger service. (*See* Joint Amtrak & CSX Transportation Plan, p. 1, marked as Amtrak Deposition Exhibit 17 and attached hereto as **Exhibit K**).  Since the MBTA has never filed, and therefore cannot produce, such a *jointly* adopted plan, it is not in compliance with § 239 as it applies to this incident and so, for yet another reason, it cannot claim the benefit of federal preemption based on its alleged compliance with § 239.

2.      Even assuming *arguendo* that the MBTA's "Plan" was in effect,
        its own terms undermine the MBTA's contention that it preempts
        the common law claims in this case.

Even assuming *arguendo* that the unilateral "MBTA Plan" was in effect, its own terms undermine the MBTA's contention that it preempts the common law claims in this case.  It simply establishes "minimum actions" (*See* MBTA Plan, § 1.1 attached as **Exhibit L**), but does

---

"railroads" are required to prepare and file such a plan.  It cannot claim to be a "railroad" for the purposes of federal preemption, but not be a "railroad" or a "common carrier" for the purposes of avoiding liability to its passengers.

not prevent the railroad from providing additional services, as contemplated by FRSA, which

"does not restrict railroads from adopting and enforcing additional or more stringent

requirements not inconsistent with this part." 49 C.F.R. § 239.1.  Its terms indicate that it is

primarily aimed at crashes and similar accidents (e.g. "After assessing their immediate area just

after the accident occurs," crew members "are to proceed to the most heavily damaged part of the

train to assist") (**Exhibit L**, MBTA Plan, § 6.1.3.3).  Of particular importance, it does not even

address - and, much less, "substantially subsume" - plaintiff's claims that "emergency medical

services, including defibrillation and advanced life support ... were readily available near the

three rail stations at which the train stopped immediately after Dr. Allen's collapse" and that "the

crew failed to ... access available emergency services at various stops along the route." (**Exhibit

B**, Complaint, p. 4 at ¶ 20).  In sum, the MBTA has not satisfied its burden of proving that, as a

matter of law, the regulations and Plan federally preempt the plaintiffs' tort claims.

>        D.    The MBTA Has Not Established As A Matter of Law That
>              It Complied Either With The Regulations Or Its Own Plan.

The MBTA has failed to satisfy its burden of proving that it complied with the federal

regulations, or with its own Plan.  As stated in *Akin v. Missouri Pacific R. Co.*, 977 P.2d 1040,

1053 (Okla.1998) (emphasis supplied), "There is no conflicting regulatory effect of entertaining a

common-law negligence claim if the federally-required warning devices are not present. **It is**

**compliance with the regulatory standard that establishes that the railroad has exercised**

**due care** and supports the pre-emption of the duty of care imposed by state negligence law."

Accord: *Birmingham v. Union Pacific Railroad Co.,* 971 F. Supp. 1282, 1286-87 (E.D. Arkansas

1997) (preemption not available under the FRSA where defendant did not establish compliance

with specific federal regulations governing the specific claims asserted by plaintiffs); *Boyd v.*

*National Railroad Passenger Corp.,* 62 Mass. App. 783, 794 (2005) (preemption defense not available because of evidence that defendant failed to comply with the federal speed limit); *Zook v. Norfolk & Western Ry Co.*, 268 Ill.App.3d 157, 162, 205 Ill.Dec. 231, 235 (1994) ("Pursuant to the Safety Act, Federal regulations have been promulgated which set maximum speeds for railroad tracks. The track speed at the accident site was 60 miles per hour. ... Since there is ample evidence, although contradicted, for the jury to find the train was exceeding 60 miles per hour, Zook's claim of excessive speed was not preempted").

The MBTA claims that "evidence on discovery showed an emergency passenger preparedness plan was adopted under FRA regulatory requirements and is followed by the MBTA." (Defendant's Memo., pp. 5-6). This claim is simply untrue, has not been proven by the defendant and is certainly not "undisputed." As set forth above (at pp. 12-14), *neither* discovery *nor* the MBTA in its filings have shown the MBTA to have been in compliance with the submission and approval requirements of § 239.201(b). Likewise, *neither* discovery *nor* the MBTA have shown the MBTA to have been in compliance with the joint adoption requirements of § 239.201(a). Similarly, *neither* discovery *nor* the MBTA has shown that the "training required by the plan was given to employees." (Defendant's Memo. at p. 6). In fact, Amtrak's Senior Instructor for Training in Boston, Daniel Peters, testified on behalf of Amtrak as follows:

> Q.    Have you even heard of or seen the MBTA emergency plan?
> A.    I only saw the plan after the incident.
> Q.    Were you ever -- did you ever instruct based upon what was contained in the MBTA emergency plan?
> A.    I did not.
> Q.    Were you ever asked to or required to, as far as you know, instruct any of your crews on what was contained in the MBTA emergency plan?
> A.    I was not.
> Q.    Do you have any idea why the MBTA had an emergency plan?
> A.    I have no idea.

(Rule 30(b)(6) Deposition of Amtrak by D. Peters, pp. 12-13, 112-115 attached as **Exhibit N**).

Furthermore, it can hardly be said, as the MBTA claims, that *anyone* complied with the

MBTA Plan on the day of the incident.  For example, while not specifically addressing "medical

emergencies" (on which the Plan is silent), the MBTA Plan required, *inter alia*, that:

> 6.1.  ... In the event of am emergency situation, it is essential that the initial
> assessment of the passenger situation, as well as the initial notification to the
> Control Center, occur as soon as possible, if not immediately following the
> emergency event ....
>
> 6.2.1.2  The Train Conductor is responsible for the initial care and evacuation (if
> necessary) of passengers.
>
> 6.2.2.3  The Train Conductor will coordinate the response of all crew members to
> any emergency situation occurring during the operation of the train.
>
> 6.1.2.4  The Train Conductor will inform arriving emergency medical responders
> of ... the location of the injured ....
>
> 6.1.3.2  All crew members will assist passengers and each other, assess the
> situation and perform accordingly ....
>
> 6.1.3.6  The first priority is to the injured, ill or infirm ....
>
> 7.1 ...  All on-board personnel will be provided initial training on the requirements
> of this Plan to ensure that they are properly prepared to respond in the event of an
> emergency situation.

(**Exhibit L**, MBTA Plan, pp. 4, 6).  As set forth in detail above (*See* pp. 2-4, 12-14, 15-16), the

defendants were not in compliance with any of these provisions of the MBTA Plan.  Under the

MBTA Plan, James Allen was entitled to "receive the best possible medical assistance, care, and

immediate cooperation" (**Exhibit L**, MBTA Plan, § 2.1). Under the MBTA Plan, the MBTA

should have endeavored "to ensure the maximum safety of passengers ... during any emergency

event." (**Exhibit L,** MBTA Plan, § 5.12).  None of these provisions were met.  So, for the MBTA

to claim that its Plan – a plan about which Amtrak's personnel were completely unaware – was "followed" is simply untrue, has not been proven by the MBTA and is certainly disputed.

Despite overwhelming evidence to the contrary, and without providing any evidence to support this claim, the MBTA contends that "Defendants essentially maintain (so far without dispute) that all pertinent state and federal rules and regulations were complied with ..." and that "there is no clear violation of federal law."(Defendant's Memo. at pp. 2 and 5). The MBTA has not even attempted to satisfy its burden of establishing an absence of genuine issues of material fact as to its compliance with the applicable plan provisions and regulations, and it cannot do so. In fact, the overwhelming evidence is to the contrary. Because it has not proven compliance with its own Plan, it has failed to satisfy its burden of proving that the claims are preempted.

III.    Common Law Tort Claims Like The Plaintiff's
        Remain Viable After Enactment of FRSA.

The MBTA has failed to satisfy its burden of proving that the affirmative defense of federal preemption is applicable to the plaintiffs' claims. On the contrary, claims substantially similar to those asserted in the present case remain viable, despite the enactment of the FRSA. For example, in *Graff v. Natrional Railroad Passenger Corp.,* 264 F.Supp. 2d 725 (N.D. Ill. 2003), the plaintiff brought negligence claims against Amtrak for its failure to provide proper treatment to her when she suffered a stroke while on an Amtrak train. This common law claim, based upon Amtrak's failure to satisfy its duty of care to its passengers, survived Amtrak's motion for summary judgment. (Amtrak's legal contentions involved its duty of care; it did not even raise the entirely inapplicable federal preemption defense.)

The law of Illinois applicable in *Graff* is consistent with the law of Massachusetts applicable in the present case. In fact, the law of Massachusetts is particularly strong as to the

duty of common carriers.  In the case of *Argueta v. Massachusetts Bay Transportation Authority*, 2 Mass.L.Rptr. 642, 1994 WL 879577 (Super. Ct. 1994) (Lauriat, J.), the MBTA conceded that it owes "the highest duty of care" to its passengers.  It is beyond dispute that James Allen was owed the highest duty of care to assist him. *Magaw v. Massachusetts Bay Transportation Authority*, 21 Mass.App.Ct. 129, 131 (1985).  The common law claim against the MBTA arising out of Dr. Allen's death is not preempted by the FRSA, and should proceed to trial.

**CONCLUSION**

For the reasons addressed above, the plaintiff respectfully requests that the MBTA's motion for summary judgment be denied.

> Respectfully submitted,
> Plaintiff, Marlene V. Allen, Executrix of the
> Estate of James R. Allen, Ph.D.
> By Her Attorneys,
>
> /s/ Bradley M. Henry
>
> _____
>
> Leo V. Boyle, BBO No. 052700
> Michael B. Bogdanow, BBO No. 544174
> Bradley M. Henry, BBO No. 559501
> MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.
> Two Center Plaza, Suite 600
> Boston, MA  02108-1922
> (617) 523-8300

**CERTIFICATE OF SERVICE**

I, Bradley M. Henry, hereby certify that on this 15th day of June 2005, I served the foregoing PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANT MASSACHUSETTS BAY TRANSPORTATION AUTHORITY FOR SUMMARY JUDGMENT, by electronic filing and by mailing an exact copy thereof, via first class mail postage prepaid to all counsel of record:  Michael J. McCormack, Esq. and David T. Mitrou, Esq., McCormack & Epstein, 1 International Place - 7th Floor, Boston, MA 02110; William J. Dailey, Jr., Esq. and Harry A. Pierce, Esq., Sloan and Walsh, Three Center Plaza, Boston, MA 0210; Michael B. Flynn, Esq. and Richard A. Davidson, Jr., Esq., Flynn & Associates, P.C., 400 Crown Colony Drive, Ste. 200, Quincy, MA 02169.

> /s/ Bradley M. Henry
>
> _____
> Bradley M. Henry

@PFDesktop\::ODMA/MHODMA/IMANAGE;BOSLIB;105576;1