COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                              SUPERIOR COURT

| | |
|---|---|
| MARLENE V. ALLEN, Executrix of the Estate of James R. Allen, Ph.D.,<br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, NATIONAL RAILROAD PASSENGER SERVICE (a/k/a "AMTRAK") and CSX TRANSPORTATION, INC.,<br><br>　　　　　　　　　　Defendants. | CIVIL ACTION<br>NO:　04-3234-B |

## COMPLAINT and DEMAND FOR TRIAL BY JURY

1. Plaintiff Marlene V. Allen ("plaintiff") is the duly appointed Executrix of the Estate of James R. Allen, Ph.D. as evidenced by Norfolk Division Probate and Family Court, Docket No. 02P2173AA. She is a resident of Wellesley, Norfolk County, Massachusetts.

2. Defendant Massachusetts Bay Transportation Authority ("MBTA") is a corporate entity organized under the laws of the Commonwealth of Massachusetts with its usual place of business at Ten Park Plaza, Boston, Suffolk County, Massachusetts.

3. Defendant National Railroad Passenger Service (a/k/a "Amtrak") is a corporate entity organized under the laws of the District of Columbia and 49 U.S.C. § 24101, et seq. with its usual place of business at 60 Massachusetts Avenue, N.E., Washington, D.C. and which regularly conducts business in Suffolk County and elsewhere in the Commonwealth of Massachusetts.

4. Defendant CSX Transportation, Inc. ("CSX") is a corporate entity organized under the laws of Virginia with its usual place of business at 500 Water Street, Jacksonville, Florida and which regularly conduct business in Suffolk County and elsewhere in the Commonwealth of Massachusetts.

5. This action is brought to recover compensatory and punitive damages for the wrongful death of James R. Allen, Ph.D. ("decedent") pursuant to Mass. Gen. L. c. 229, §1, et. seq. and for wrongful conduct on the part of the defendants pursuant to c. 93A, §2, et. seq.

**EXHIBIT B**

## FACTUAL BACKGROUND

6. At about 8:46 a.m., on July 30, 2002, decedent James R. Allen ("Dr. Allen") boarded MBTA commuter rail train P514 at the MBTA's Wellesley Hills commuter rail station and took an aisle seat on the lower level of one of the train's five, bi-level passenger cars.

7. At about 8:52 a.m., Dr. Allen began to gasp and make raspy, snore-like sounds drawing the attention of several passengers. Within moments, Dr. Allen slumped sideways with his head and shoulders over the armrest into the aisle. A nearby passenger immediately checked on him while another flagged down an Amtrak assistant conductor. As the assistant conductor arrived, another passenger checked and found Dr. Allen's skin purplish and clammy. Upon finding no pulse, the passenger quickly laid Dr. Allen down as another passenger suggested that the assistant conductor make a public address announcement for anyone with medical training to report to scene of the emergency.

8. A fellow passenger with a medical doctor's degree arrived just as Dr. Allen was being laid down. Finding Dr. Allen unresponsive, the doctor assessed his airway and heard another of the snore-like sounds, but could find no pulse. Asking the Amtrak personnel if 911 had yet been called, at about 8:53 a.m., the doctor immediately began cardiopulmonary resuscitation ("CPR"). Other passengers heard that someone was "not breathing" and, with their assistance, Dr. Allen was moved to the rear vestibule where CPR was continued. Two Amtrak assistant conductors were present when it was clearly stated that Dr. Allen had no pulse, was not breathing and was, therefore, critically ill.

9. CPR was ongoing when the train pulled into Auburndale station in Newton at about 8:54 a.m. The stop was longer than usual, and many passengers assumed the crew was awaiting paramedics. More than one passenger offered to call 911 for the crew, but were told: "we've got it." As commuters boarded at Auburndale, the crew decided that the train would proceed to Back Bay located four stations, and nearly twenty minutes, away.

10. Newton-Wellesley Hospital ("NWH") is located one mile from the Auburndale station and is about one minute away by ambulance. Newton Fire Station No. 2 is located less than six-tenths of a mile, or about forty-five seconds for an emergency vehicle, from the Auburndale station. Like all ambulances regularly serving NWH, as of July 30, 2002, every Newton Fire Department emergency vehicle contained portable external defibrillation equipment. Between 8:40 a.m. and 9:05 a.m., rescue vehicles and personnel were in quarters at the Fire Station No. 2 and were available to respond if called. Despite this, Train P514 departed Auburndale at about 8:56 a.m.

11. It was not until the train was stopped at Auburndale that Amtrak's lead conductor arrived at the scene to evaluate the emergency. When challenged by passengers as to why they were not awaiting medical assistance, the conductor inaccurately stated that emergency personnel could not access the station down the 34, six-foot-wide steps from the roadway

to the platform. As the train departed Auburndale, the crew had still made no attempt to contact emergency medical services or to even report the situation as an emergency either to dispatch or to anyone else.

12. As Train P514 proceeded on its usual schedule from Auburndale to West Newton, Amtrak's lead conductor was observed casually collecting tickets from seat-backs. It was not until the train slowed for its scheduled stop at West Newton, minutes later, that the engineer reached CSX dispatch in Albany, New York, to advise, incorrectly, that: "Our conductor's got a passenger who has apparently passed out, he's breathing, but passed out. We need medical attention at Back Bay station." That call was placed to CSX in Albany, rather than to local Emergency Medical Services ("EMS") or MBTA or Amtrak officials because CSX required that all such communications be directed through it. Neither the conductor nor the engineer declared an emergency as provided for under all standard railroad operating rules or under the operating rules of either the MBTA or Amtrak. The train crew made no attempt to make direct, local contact with Amtrak, the MBTA, EMS or 911.

13. The conductor's description of the emergency was first conveyed by radio to the train's engineer who conveyed the erroneous message by radio to CSX Albany Dispatch which then conveyed the message to Amtrak dispatch at South Station which conveyed the message to Amtrak emergency dispatch elsewhere in South Station which, at last, called Boston EMS via 911. That call was placed a full ten minutes after the conductors first knew that Dr. Allen had no pulse, was not breathing and was receiving CPR.

14. As Train P514 slowed to a stop at West Newton, another passenger challenged the lead conductor and demanded to know why, if they had to proceed to Back Bay, they were still stopping for passengers instead of going straight through. The conductor responded, "What about the people on the platform?" and dismissed the passenger, telling him to "take it up with the T." Passengers looked on in disbelief as the crew made yet another routine stop to disembark and board commuters. Many on board began yelling at the crew to do something.

15. Newton Police Headquarters is located about two hundred yards from the MBTA's West Newton commuter rail station. A portable, Automated External Defibrillator ("AED") was available in or near the Police Station's front lobby. All Newton police vehicles were equipped with AEDs. One such vehicle was sitting in front of Police Headquarters between 8:39 and 9:00 that morning. No fewer than four other vehicles were on patrol just moments away. Two more such vehicles were outside at the Police Department's Chestnut Street Annex down the street. Despite this, Train P514 pulled out of West Newton at 9:00:41. a.m.

16. Within about thirty seconds after departing West Newton, a young man trained as an Emergency Medical technician ("EMT") arrived to assist in providing CPR to Dr. Allen. The young man urgently instructed the crew to call ahead and have paramedics waiting at Newtonville, the next stop, but when the conductor responded that they could not and that

- 3 -

it would somehow be faster to have paramedics waiting at Back Bay, the young man told him to make certain they were routed express. None of these instructions were heeded.

17. Shortly after the train departed West Newton, another concerned passenger followed a male crew member through a car demanding to know what they were doing and seeking assurances that, if they had to proceed to Back Bay, the train would make no further stops en route. When the conductor asked the passenger why, the man explained in disbelief the seriousness of Dr. Allen's medical situation and that he would die if the crew continued to stop for passengers. The conductor promised that no more stops would be made. The train then made yet another routine stop for passengers at the Newtonville station at 9:02:39 a.m.

18. Newton Fire Station No. 4 is located less than one-half mile from the Newtonville station and is staffed with rescue personnel and paramedics who were in quarters at 9:00 a.m. on July 30, 2002. Travel time from the firehouse to the MBTA's Newtonville station is approximately 45 seconds.

19. At about 9:15 a.m., Train P514 pulled into Back Bay station. The medical doctor and her assistants continued CPR until Boston EMS paramedics took over. According to the EMS Report, the train crew claimed that they had started CPR at 8:50 a.m. In the hands of the paramedics, Dr. Allen's heart was sufficiently strong that defibrillation produced a pulse and rhythm for 30-40 seconds before Dr. Allen's heart returned to ventricular fibrillation. However, despite having been provided advanced emergency care en route to Boston City Hospital, James Allen was declared dead at 10:14 a.m.

20. At the time of Dr. Allen's collapse and cardiopulmonary resuscitation, it was or should have been clear to the train's crew that Dr. Allen needed emergency medical services, including defibrillation and advanced life support, and that such services were readily available near the three rail stations at which the train stopped immediately after Dr. Allen's collapse. As a result of the gross negligence, recklessness and unfair acts and practices of the defendants, the crew failed to immediately contact emergency services, failed to report the emergency in a timely manner, and failed to access available emergency services at various stops along the route. Had the defendants satisfied their duty of care to Dr. Allen, he would have recovered from this incident and resumed his regular activities; instead, the decedent died as a result of the negligence, gross negligence and violations of Mass. Gen. L. c. 93A on the part of the defendants, their employees and agents.

## COUNT I
### Wrongful Death - Compensatory Damages

21. Plaintiff incorporates and reasserts paragraphs 1 through 20 of this Complaint as if set forth fully herein.

22. The defendants each owed a duty of reasonable care to James R. Allen.

23. The defendants, their employees and agents were negligent on, and prior to, July 30, 2002 with respect to the operation of the MBTA commuter rail system by, among other things, failing to take reasonable steps in response to Dr. Allen's need for emergency services, failing to have and follow adequate emergency and communications procedures and failing to properly train their personnel.

24. The defendants breached their respective duties of reasonable care owed to James R. Allen.

25. As a proximate result of the defendants' breaches of duty, James R. Allen suffered grievous injuries of body and mind, as well as pain and suffering, which ultimately led to his death, and his family and next of kin suffered and incurred funeral, burial and other expenses associated with his death. Furthermore, his family and next of kin have been deprived of his love, services, protection, care, assistance, society, comfort, companionship, guidance, counsel and advice and decedent's estate has been deprived of the economic value of his capacity to earn money during the normal span of his life.

WHEREFORE, the plaintiff, Marlene V. Allen, Administratrix of the Estate of James R. Allen, Ph.D., pursuant to the Massachusetts Wrongful Death Act, Mass. Gen. L. c. 229, § 2, prays that judgment be entered against the defendants in an amount which will fairly and adequately compensate for the death of James R. Allen and all other damages recoverable under said statute, together with interest, costs, attorneys' fees and such other relief as may be appropriate.

## COUNT II
### Wrongful Death - Punitive Damages

26. Plaintiff incorporates and reasserts paragraphs 1 through 25 of this Complaint as if set forth fully herein.

27. The defendants' conduct, acts and omissions were grossly negligent and reckless.

28. As a proximate result of the defendants' grossly negligent and reckless conduct, acts and omissions, James R. Allen suffered grievous injuries of body and mind, as well as pain and suffering, which ultimately led to his death.

WHEREFORE, the plaintiff, Marlene V. Allen, Administratrix of the Estate of James R. Allen, Ph.D, pursuant to the Massachusetts Wrongful Death Act, Mass. Gen. L. c. 229, § 2, prays that judgment be entered against the defendants in an amount which will adequately punish and deter said defendants for their gross negligence and recklessness, together with interest, attorneys' fees and costs and such other relief as the court deems just and appropriate.

## COUNT III
### Violations of Mass. Gen. L. C. 93A

29. Plaintiff re-alleges and incorporates herein paragraphs 1 through 28 of this Complaint as if set forth fully herein.

30. The defendants owned, operated, controlled, marketed, supervised, contracted for and otherwise engaged in the trade or commerce of providing transportation services to consumers in the Commonwealth.

31. The defendants violated the Massachusetts Consumer Protection Act, Mass. Gen. L. c. 93A, with respect to the operation, control and provision of services on and for the MBTA commuter rail system on, and prior to July 30, 2002, by, among other things, violating safety rules and regulations intended to protect consumers and failing to develop, institute and implement proper emergency medical procedures and preparedness training.

32. As a direct and proximate result of such violations, the decedent, his family, his next-of-kin and his estate were caused to suffer damages as set forth above rendering the defendants liable for an award of compensatory damages and attorneys' fees. As such violations were willful and knowing, defendant is liable for double or treble damages pursuant to c. 93A.

33. Moreover, on or about January 14, 2003, plaintiff sent a detailed demand letter in accordance with the Massachusetts Consumer Protection Act Mass. Gen. L. c. 93A to each defendant. The defendants failed to respond as required by c. 93A and, for that failing, have further violated c. 93A and are liable for damages thereunder.

WHEREFORE, the plaintiff, pursuant to Mass. Gen. L. c. 93A, prays that judgment be entered against the defendants for compensatory damages in an amount which will fairly and adequately compensate for the decedent's death and for double or treble damages as a result of defendant's willful and knowing violations of c. 93A, together with all recoverable interest, attorneys' fees and costs and all such other relief as the court deems just and appropriate.

### PLAINTIFF'S DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on each claim asserted and on each defense so triable.

The Plaintiff,
By Her Attorneys,

_____
Leo V. Boyle, BBO No. 052700
Bradley M. Henry, BBO No. 559501
MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.
Two Center Plaza, Suite 600
Boston, MA 02108-1922
(617) 523-8300

DATED: 21 July 2004