# ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

04-12080-PBS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
MARLENE V. ALLEN, Executrix of the     \*
Estate of James R. Allen, Ph.D.,       \*
                    Plaintiff,         \*
                                       \*
            V                          \*
                                       \*
MASSACHUSETTS BAY TRANSPORTATION       \*
AUTHORITY, et al.,                     \*
                    Defendants.        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



        Deposition of JAMES A. PEROS, JR.,

taken on behalf of the Plaintiff, pursuant

to Notice under the Federal Rules of Civil

Procedure, before Janice A. Maggioli, RPR,

RMR, CRR, and Notary Public in and for the

Commonwealth of Massachusetts, at the offices

of Meehan, Boyle, Black & Fitzgerald, Two

Center Plaza, Boston, Massachusetts, on

December 7, 2004, commencing at 10:07 a.m.


**EXHIBIT D**

5

1          MR. PIERCE:  Right.

2          MR. HENRY:  And my understanding

3   is CXS does not have any witness statements.

4          MR. DAVIDSON:  Once again, we do

5   not have witness statements.

6          MR. HENRY:  I have these for

7   you.  These are our witness statements.  They

8   were sealed on the 17th, so they haven't

9   changed, and I will go start getting these

10  photocopied.

11          (Pause).

12          MR. HENRY:  Let's go ahead and

13  swear our witness, please.

14

15          JAMES A. PEROS, JR.,

16          having been satisfactorily

17          identified and duly sworn by the

18          Notary Public, was examined and

19          testified as follows:

20          EXAMINATION BY MR. HENRY

21  Q.   Could you state your complete name for the

22       report, please?

23  A.   James A. Peros, Junior.

24  Q.   And does A stand for anything?

15

tickets and things was car number 1 and maybe

the first part of car number 2?

A.    Correct.

Q.    And are you able to hear in car number 1 and/or

car number 2 any PA announcements?

A.    Yes.

Q.    And those are PA announcements that could be

made in car 3 or somewhere else on the train,

correct?

A.    Correct.

Q.    Prior to arriving in Auburndale, had you heard

any PA announcements regarding a medical

emergency?

A.    No, I didn't.

Q.    When is the first time that you heard a PA

announcement seeking passengers with medical

training to respond to a medical emergency?

A.    Between -- I believe it was between Auburndale

and West Newton.

Q.    Did you get on the radio at any time to get an

update from either Walter LaCombe or Susan

Bergeron regarding the condition of this

passenger?

A.    I walked back at West Newton.  I walked back at

West Newton and saw that the gentleman was

receiving CPR.

Q.    I'm going to show to you a timetable.

Timetable may not be the right term.   A

passenger's commuter rail schedule dated June

22, 2002.

                MR. HENRY:   Now, I have copies

that I think Amtrak provided in its

disclosures, but they are rather poor copies.

I'm going to have them confirm that they are a

match as best I can.   Here are the copies that

Amtrak provided if you want copies.

                MR. DAVIDSON:   Thank you.

Before you go on, can we get an agreement that

we go sequentially with exhibit numbers

throughout the deposition?

                MS. SOISSON:   We already didn't

do that.

                MR. HENRY:   I think we've

already started LaCombe, Bergeron, but it was a

good idea, just half a deposition too late.

                MS. SOISSON:   Before we -- this

is not -- the last page is not part --

                MR. HENRY:   Take that last page

out.   I'm not going to include that.   That's

something different.

Q.    Mr. Peros, do you recognize this document?

A.    It appears to be a copy of a

Framingham/Worcester schedule.

Q.    Is there any way based on that document to

identify what date that schedule started?

A.    Not from this -- no.

Q.    Then let's put that aside for one moment, and

I'm going to give you an actual commuter rail

schedule and ask you if you can tell me the

date of applicability for that schedule?

A.    Effective June 22, 2002.

Q.    Is that the schedule that would have been

applicable at the time of this incident?

A.    That's correct.

            MR. HENRY:   I'd like to mark the

actual schedule as Peros Exhibit 1A and the

document that I'll represent for the record is

produced by Amtrak in its disclosures as the

applicable schedule as Exhibit 2 -- I'm sorry,

1B.

            (Exhibit 1A, Train schedule,

            marked for identification.)

(Exhibit 1B, Train schedule,

marked for identification.)

Q.   Mr. Peros, on the day of this incident, as far

as you recall, was train P514 operating on

schedule?

A.   Yes, it was.

Q.   And based on that, my understanding is it would

have placed you in Auburndale at 8:52; is that

accurate?

A.   That's what the schedule says.

Q.   And so is it your testimony that the first you

learned that there was a medical emergency on

board was at 8:52?

            MS. SOISSON:  Objection.  You

can answer.

A.   The first I learned is when we were in

Auburndale.  I don't have any specific

remembrance of what time it was.  If the

schedule says it was 8:52, then it was 8:52.

Q.   Where were you -- you said you were on the

platform when you talked to Mr. LaCombe.  Do

you recall what car you were in front of?

A.   Probably between the second and third.

Q.   Do you recall what door you entered when you

got back on the train at Auburndale?

A.    No.

Q.    Did you take any steps to go and assess the
medical situation in car 3 at any time before
leaving Auburndale?

A.    No.

Q.    And is it your testimony that you walked back
to check on the situation when the train was
stopped at the West Newton stop?

A.    No.

Q.    When did you first check on the situation to
assess it for yourself?

A.    Somewhere between Auburndale and West Newton,
four minutes running time between there, so in
that time frame.

Q.    Sometime during the four minutes between
Auburndale and West Newton?

A.    Correct.

Q.    And have you ever given a statement that says
anything different than that?

A.    I have only given one statement.

Q.    And it's your recollection that that statement
would say between Auburndale and West Newton
you went and checked on the situation to assess

20

it for yourself?

A.    I don't recall what that statement says at the

moment.  We might have been pulling into West

Newton at the time.  The exact moments I don't

recall them.

Q.    Your testimony today was between Auburndale and

West Newton?

A.    It could have been when we were stopped at West

Newton.

Q.    So your testimony -- are you changing your

testimony?

A.    No, I'm not.

Q.    You are saying that your earlier statement that

it was between Auburndale and West Newton is

not accurate in that you could have also been

stopped at West Newton?

A.    Somewhere between Auburndale and stopping at

West Newton I observed that the gentleman was

receiving CPR.

Q.    The time that you would arrive at or be in the

station at West Newton would have been 8:56; is

that correct, according to the schedule?

                   MS. SOISSON:  Objection.

A.    According to the schedule.

that quote, "Our conductor's got a passenger
who has apparently passed out.  He is
breathing, but he's passed out.  We need
medical assistance at Back Bay"?

                MS. SOISSON:  Objection.  You
can answer.

A.    I have no recollection of hearing him say that.

Q.    Were you listening to the radio transmissions
regarding the medical emergency?

A.    I might not have specifically heard what he
said.

Q.    The question is, were you listening for it?

A.    The answer is no.

Q.    Did you ever attempt to call emergency medical
services yourself?

A.    No.

Q.    Did you hear any passengers suggest that you
call 911?

A.    I recollect that when I was going from my
observation of the passenger's condition
receiving CPR to get my telephone to call, that
passengers were saying things, but I have no
specific recollection of what they were saying
because my focus was not on my passengers.  My

39

focus was on getting to a telephone to ensure

that we had somebody waiting at Back Bay.

Q. You recognized the urgency of the situation

upon observing Dr. Allen, correct?

A. That's correct.

Q. And your testimony was that was somewhere

between Auburndale and West Newton, correct?

A. That's correct.

Q. And as best you can tell, Bruce Held had

already attempted to contact CSX before you

arrived in West Newton, correct?

A. No.  Oh, wait a minute.  West Newton, yes.

Between Auburndale and West Newton, that's

correct.

Q. Based on your conclusion that the stairs at

Auburndale, West Newton, and Newtonville

presented an access difficulty to medical

personnel, why did you not instruct Held to

have CSX route you directly to Back Bay?

A. By the time I realized the severity of the

situation, it was Newton -- it was West Newton,

three minutes to Newtonville, and then direct

to Back Bay.

Q. But you recognized at that time that every