1

**ORIGINAL**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

04-12080-PBS

```
*****************************************
MARLENE V. ALLEN, Executrix of the      *
Estate of James R. Allen, Ph.D.,        *
              Plaintiff,                *
                                        *
        V                               *
                                        *
MASSACHUSETTS BAY TRANSPORTATION        *
AUTHORITY, et al.,                      *
              Defendants.               *
*****************************************
```

Deposition of NATIONAL RAILROAD PASSENGER CORPORATION, By LARRY R. BEARD, taken on behalf of the Plaintiff, pursuant to Notice under the Federal Rules of Civil Procedure 30(b)(6), before Janice A. Maggioli, RPR, RMR, CRR, and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Meehan, Boyle, Black & Fitzgerald, Two Center Plaza, Boston, Massachusetts, on May 20, 2005, commencing at 10:05 a.m.

**EXHIBIT M**

```
 1                    identified and duly sworn by the
 2                    Notary Public, was examined and
 3                    testified as follows:
 4                    EXAMINATION BY MR. HENRY
 5   Q.   Sir, can you state your full name for the
 6        record, please?
 7   A.   Larry Robert Beard.
 8   Q.   Mr. Beard, you're here today as a designated
 9        witness on behalf of Amtrak; is that your
10        understanding, as well?
11   A.   Yes, sir.
12   Q.   And have you had your deposition taken before?
13   A.   Yes.
14   Q.   And when was the last time?
15   A.   About eight months ago.
16   Q.   And how many times, estimating, have you had
17        your deposition taken?
18   A.   About a half a dozen.
19   Q.   So you're generally pretty familiar with the
20        deposition process, right?
21   A.   Uh-huh.
22                    MS. SOISSON:  You have to answer
23        verbally.
24   Q.   There you go.  That was a test question.
```

1  years I was a safety engineer, which was the
2  fun part because it's all field work.  You get
3  to do what safety people like to do, and that's
4  be with the people, and did that for the next
5  two and a half years.
6            The manager moved on, and I
7  became the Safety Manager.  So we're looking at
8  -- let me see if I can get my dates.  I'm
9  reading upside down from you, so '94 to '97.
10 So May of '97.  All this stuff happens in May.
11 I'm not sure why.
12           May of '97 I went back to being
13 a safety manager, but it was for the
14 mid-Atlantic division, and that division
15 handled everything from the middle of the
16 bridge at Trenton, New Jersey down, to
17 Richmond, Virginia; Williamsburg; out to
18 Harrisburg, and the trains that went from
19 Washington to Chicago there were two of them,
20 and the one that went from Washington to I
21 guess it was Atlanta, that's as far as we ran
22 on that one.
23           And then in May of 2000 I moved
24 up to corporate, corporate headquarters.  I

1 became the Director of Plans and Programs for
2 the safety office, corporate safety office, and
3 on September the 18th of 2001 the corporate
4 safety office was incorporated into the police
5 department after 9/11, and in October of that
6 year the Office of Emergency Preparedness was
7 established because the plans and programs --
8 about a third of what I did was emergency
9 preparedness along with safety plans and
10 programs, and they decided that they needed a
11 bigger voice.  So in October of 2001 they
12 established the Office of Emergency
13 Preparedness, and that's where I've been ever
14 since.
15     MS. SOISSON:  But the question
16 was your education.  I'm just going to remind
17 you.
18 A. I'm sorry.
19 Q. Now I'm going to ask you what you've done over
20 the last 20 years.
21 A. Let me go back to the education.
22     THE WITNESS:  You should have
23 kicked me.  I knew this was coming.  I've been
24 in too many depositions.  That's the trouble.

```
 1         want to finish and anything else.
 2   A.    And maybe you and I --
 3   Q.    I can try to rephrase the question some.
 4   A.    Okay.
 5   Q.    Does a commuter railroad -- is it required, as
 6         you understand it, to have a passenger
 7         emergency preparedness plan?
 8   A.    Yes.
 9   Q.    And that's according to regulations under the
10         Federal Railroad Administration?
11   A.    Yes.
12   Q.    And when is the first time you became aware or
13         familiar with those regulations?
14   A.    When they were developed.
15   Q.    And that was in 1998?
16   A.    That's correct.
17   Q.    And what role, if any, did you have in
18         emergency preparedness with respect to the
19         FRA's '98 regulations?
20   A.    None really.
21   Q.    At that time you were a field person in safety?
22   A.    I was a field person, that's correct.
23   Q.    When was the first time you started to have
24         direct -- started to have to have direct
```

63

```
 1        familiarity with 49 CFR 239?
 2   A.   May of 1991 -- I'm sorry, May of 2000 when I
 3        came on board in corporate.
 4   Q.   Now, I understand -- this is a big question, so
 5        generally, overall, what does 49 CFR 239 -- is
 6        that the right number?
 7   A.   Yes.
 8   Q.   Require of a railroad operation in terms of
 9        having a plan?
10                    MS. SOISSON:  I'll object to the
11        form, but you can answer.
12   Q.   She's saying I didn't ask it very well, and she
13        wants to reserve her rights.
14                    MS. SOISSON:  You can go ahead
15        and answer the question.
16   A.   Without paraphrasing the regulation, the
17        regulation requires that any passenger train
18        operation has a joint passenger emergency
19        response plan with the host railroad, and it is
20        the operating railroad's responsibility to take
21        care of that plan.  That regulation sets forth
22        certain requirements to be included in the plan
23        and to be addressed by the plan.  It may not be
24        specifically included, but addressed by it.
```

1           And that's the key to the whole
2 thing, and it's between two railroads, who is
3 listed as the operating railroad and who is
4 listed as the host railroad, the host railroad
5 being the steel you are running on. The host
6 is the overall owner of the company that is
7 running the equipment on the railroad.
8 Q. So if Amtrak owns a particular segment of rail
9 over which its own trains and other entities'
10 trains run in that capacity, it's considered
11 the host railroad?
12 A. That's correct.
13 Q. And if Amtrak owns the equipment, the stock
14 rolling over those rails, then Amtrak would be
15 considered the operating railroad?
16 A. That's correct.
17 Q. What if Amtrak neither owns the rails nor the
18 rolling stock, the equipment, but is, in fact,
19 operating -- has the personnel operating either
20 the switches and the signals of the rails or
21 the rolling stock?
22 A. We would be -- then you are getting into the
23 contracts between who hired us to run that, and
24 we would be, as you have said, an independent

```
 1            contractor.
 2    Q.      And so you would be a contractor either to the
 3            operating railroad or a contractor to the host
 4            railroad or maybe both?
 5    A.      That's correct.
 6    Q.      When Amtrak is a contractor to let's say the
 7            operating railroad, what role, if any, does
 8            Amtrak have in developing or implementing the
 9            Emergency Preparedness Plan required by is it
10            Part or Section 239?
11    A.      Part 239.  It depends on the contract we have
12            with the contractor.  It depends on what they
13            want us to do.
14    Q.      So Amtrak's role is defined by the contract
15            with the operating railroad, correct?
16    A.      That's correct.
17    Q.      Do you happen to know -- and I understand that
18            you may not.  Do you happen to know what
19            Amtrak's role was with the operating railroad
20            of the MBTA as of or since May of 2000?
21    A.      No, I do not.
22    Q.      But, in any event, whatever role Amtrak was to
23            play or was required to play presumably would
24            be defined in the operating agreement?
```

```
 1   A.   That's correct.
 2   Q.   If Amtrak is providing personnel pursuant to a
 3        contract to a commuter rail and the particular
 4        segment of track happens to be owned by Amtrak,
 5        then Amtrak would be required to have a joint
 6        Emergency Preparedness Plan with the operating
 7        railroad to which its contracted?
 8   A.   Run that one by me again.
 9   Q.   If Amtrak is the host railroad but is also
10        contracted to the operating railroad, then
11        Amtrak would be required to have a joint
12        Emergency Preparedness Plan with the operating
13        railroad?
14   A.   Okay.  Yes.
15   Q.   Is that right?
16   A.   Yes.
17   Q.   I just want to be sure I understand how these
18        work.  If Amtrak is contracted to an operating
19        railroad and is traveling over the track of
20        somebody other than Amtrak or the operating
21        railroad, does Amtrak's own Emergency
22        Preparedness Plan -- Passenger Emergency
23        Preparedness Plan come into play at all?
24   A.   No.
```

|   |    |   |
|---|----|---|
| 1 |    | emergency planning response for planning for |
| 2 |    | mitigation and response for emergencies, large |
| 3 |    | scale or minor. |
| 4 | Q. | I understand this is going to be a gross |
| 5 |    | simplification, but generally is it fair to say |
| 6 |    | that corporate safety is involved more in the |
| 7 |    | accident prevention and day-to-day work safety |
| 8 |    | issues and even maybe day-to-day passenger |
| 9 |    | safety issues whereas emergency preparedness is |
| 10 |   | reactive and responds to a situation that |
| 11 |   | develops? |
| 12 | A. | And development of mitigation for problems. |
| 13 | Q. | Now, you had talked about the interaction |
| 14 |   | between the operating railroad and Amtrak as a |
| 15 |   | service provider to that railroad regarding its |
| 16 |   | Emergency Preparedness Plan would be at the |
| 17 |   | local commuter level, Amtrak's local commuter |
| 18 |   | level, and with the Corporate Training |
| 19 |   | Department perhaps through the division, but |
| 20 |   | also it would be through your office, emergency |
| 21 |   | preparedness? |
| 22 | A. | That's correct. |
| 23 | Q. | In a scenario such as we have here who, if you |
| 24 |   | know, is the host railroad for the |

1                Framingham/Worcester line?
2    A.    If my memory serves me right, it's CSX.
3    Q.    And the operating railroad for the commuter
4          service is the MBTA?
5    A.    That's correct.
6    Q.    And Amtrak is the service provider --
7    A.    We're the contractor.
8    Q.    Now, presumably that would mean based on what
9          you described, that the MBTA would be required
10         to have a joint emergency preparedness plan
11         developed with CSX in order to be in compliance
12         with 49 CFR 239; is that correct?
13                    MS. SOISSON:  Objection.  You
14   can answer.
15                    MS. JUMPER:  Objection.
16                    MS. SOISSON:  Give me a chance
17   to get the objection in there.
18                    THE WITNESS:  I'm sorry.
19                    MS. SOISSON:  That's okay.
20   A.    Yes.
21   Q.    To put it another way:  With CSX being the host
22         railroad for the Framingham/Worcester line and
23         the MBTA being the operating railroad, as of
24         the date of this incident in 2002, the MBTA

```
 1              would be required under the FRA regulations to
 2              have a joint passenger emergency preparedness
 3              plan; is that an accurate statement?
 4                       MS. SOISSON:  Objection.
 5                       MS. JUMPER:   Objection.
 6                       MS. SOISSON:  You can answer.
 7              Go ahead.
 8      A.      Yes.
 9      Q.      Do you know one way or the other based on what
10              you have reviewed and what Amtrak has provided
11              whether any such plan existed?
12      A.      In 2002 I remember there being a plan.  I do
13              not have a copy of that 2002 plan.
14      Q.      Do you mean you don't have a copy right now or
15              you didn't have a copy then?
16      A.      I would have had -- I remember having a copy
17              then.  We no longer have the contract with
18              them, and I have kept the last of anything we
19              have with them, which would have been 2003.
20      Q.      Now, as we've discussed, the reason Amtrak
21              would need to have this plan would be because
22              you're operating the service under contract
23              with the MBTA, and it's important that your
24              train crews be trained pursuant to that plan?
```

```
 1  A.   That's one -- yes.
 2  Q.   Tell me the -- let me go back a little bit.
 3                 If the operating railroad also
 4  owns the rails over which it's running, then
 5  there's not a need for a joint plan.  It is a
 6  single --
 7  A.   That's correct.
 8  Q.   -- consolidated plan?  What are the
 9  requirements, if you know and to the extent you
10  know, of the two entities, the operating
11  railroad and the host railroad, when they are
12  different entities; in other words, how do they
13  come up with a plan?
14  A.   If you have two separate entities, is that the
15  question?
16  Q.   Yes.
17  A.   I.e., like the MBTA and CSX; is that what
18  you're asking?
19  Q.   Yes.
20  A.   How they do it I do not know.  You are asking
21  how we do it?
22  Q.   Sure.
23  A.   All right.
24  Q.   Well, even before that.  Does Amtrak own any of
```

Case 1:04-cv-12080-PBS    Document 41-14    Filed 07/15/2005    Page 14 of 16
57

```
 1          the rails over which the MBTA runs, as far as
 2          you know?
 3    A.    Bits and pieces of them.  I don't know the
 4          exact ones.  I don't have that committed to
 5          memory.
 6    Q.    Fair enough.  Do you know if Amtrak and the
 7          MBTA have a joint Emergency Preparedness Plan?
 8    A.    Amtrak has a plan for the Northeast Corridor
 9          that we send out that covers Boston to
10          Washington operations and Harrisburg, and then
11          those ancillary little feeder lines come in,
12          and that is sent out for coordination among
13          everybody that we operate on, and there's bits
14          and pieces in there, 50 miles here, 10 miles
15          there, and instead of doing a plan for 10 miles
16          or 50 miles, we combine it into one great big
17          one at the okay of the FRA, and it's easier for
18          them to understand it that way.  Instead of
19          having 25 plans for the Northeast Corridor,
20          they have one.
21    Q.    Got it.
22    A.    And that just makes it -- and we always make
23          sure that it's coordinated through these other
24          entities.
```

```
 1   Q.   And over those portions of Amtrak-owned rails
 2        over which the MBTA is operating, then Amtrak's
 3        kind of single-consolidated plan for the
 4        Northeast Corridor would be the controlling --
 5   A.   That's correct.
 6   Q.   -- emergency plan?
 7   A.   That's correct.
 8   Q.   For portions or tracks that are not owned by
 9        Amtrak, then whatever plan the MBTA has if the
10        MBTA owns the track, then it would be the MBTA
11        plan?
12   A.   That's correct.
13   Q.   And if it's -- if there's another host
14        railroad, then it would be the joint plan
15        between the MBTA and whatever the host --
16   A.   Whatever the host is, that's correct.
17   Q.   What would Amtrak do, if you know, I'm not sure
18        that you have ever encountered this scenario,
19        but if the host railroad and the operating
20        railroad were not in compliance with 49 CFR 239
21        in having a joint plan?
22                  MS. SOISSON:  Objection.  You
23        can answer.
24                  MS. JUMPER:  Objection.
```

| | | |
|---|---|---|
| 1 | A. | We would notify them, hey, guys, you've got a |
| 2 | | problem.  You need to straighten it out.  And |
| 3 | | if it affects the operation of our crews, we |
| 4 | | would make sure they -- we would probably get |
| 5 | | very vocal about it.  I'm sure -- I know we |
| 6 | | would, and make sure that it was corrected as |
| 7 | | soon as possible.  The FRA since '98 has made |
| 8 | | sure in conjunction with FTA, Federal Transit, |
| 9 | | that everybody has got a plan. |
| 10 | Q. | Now, back to where I was starting with some of |
| 11 | | this.  In those instances where Amtrak is |
| 12 | | either the operating railroad or the host |
| 13 | | railroad, one of those two parties, how does |
| 14 | | the development of a joint plan with a separate |
| 15 | | entity come about; in other words, is there a |
| 16 | | standard way of approaching the development of |
| 17 | | the amendment of a joint plan? |
| 18 | A. | Yes, sir, there is. |
| 19 | Q. | And what's that? |
| 20 | A. | What we do is we take the requirements of the |
| 21 | | CFR, lay them out in a plan.  It tends to be |
| 22 | | paragraph 1, 2, 3, 4, whatever.  When we |
| 23 | | initially looked at it back in 2000 when I |
| 24 | | first came on board, there was no |