UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARLENE V. ALLEN, Executrix of the Estate of James R. Allen, Ph.D.,<br>　　　　　　　　　　　　Plaintiff,<br>v.<br><br>MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, NATIONAL RAILROAD PASSENGER SERVICE (a/k/a "AMTRAK") and CSX TRANSPORTATION, INC.,<br>　　　　　　　　　　　　Defendants. | CIVIL ACTION<br>NO: 04-12080-PBS |

**PLAINTIFF'S CONCISE STATEMENT OF DISPUTED FACTS
IN OPPOSITION TO THE SUMMARY JUDGMENT MOTION OF THE
<u>DEFENDANT MASSACHUSETTS BAY TRANSPORTATION AUTHORITY</u>**

Pursuant to Rule 56.1 of this Court's Local Rules, the plaintiff, Marlene V. Allen, Executrix of the Estate of James R. Allen, Ph.D., files this concise statement of material facts of record as to which it is contended that there exist genuine issues to be tried. By way of preface, this case arises out of the July 30, 2002 death of plaintiff's decedent, James R. Allen, Ph.D. ("Dr. Allen") who suffered a cardiac arrest onboard a Massachusetts Bay Transportation Authority ("MBTA") commuter train which would not stop for medical assistance but, instead, continued to board and disembark passengers at three station stops over a period of more than twenty minutes. For the convenience of comparison to "Statement of Material Facts of Record" submitted by the MBTA, plaintiff sets forth her disputed facts in a parallel, enumerated fashion.

**MATERIAL FACTS IN DISPUTE**

It should first be noted that the MBTA claims that it is entitled summary judgment based on the defense of federal preemption. However, the MBTA failed to assert federal preemption as

an affirmative defense in its Answer and, apparently, concedes its failure to have properly asserted that defense in a recently proposed but, as yet, unfiled motion to amend. (*See* MBTA's Motion for Leave to File First Amended Answer and Crossclaim attached to Plaintiff's Opposition as **Exhibit A**.)

(1)   The MBTA asserts a misleading distinction in ¶ 1 of its Statement of Facts in noting that Dr. Allen was traveling on an "MBTA-owned and Amtrak-operated" commuter rail train when he suffered a cardiac arrest. This "owned" versus "operated" distinction is in significant dispute given that the MBTA is a common carrier and a passenger "railroad" as that term is defined under 49 C.F.R. § 239.7. (*See* Plaintiff's Opposition, p. 13, n. 3). Moreover, according to the MBTA's Passenger Train Emergency Preparedness Plan upon which the defendant relies heavily in its claim for summary judgment based on federal preemption, "[f]or the purposes of [the MBTA Plan], the term "MBTA COMMUTER RAIL refers to MBTA employees, Amtrak employees and all their primary contractors, either collectively or individually, that are responsible for providing the commuter rail service." (*See* MBTA Plan, §2.3 attached to Plaintiff's Opposition as **Exhibit L**).

(2 - 4, 12)   With respect to ¶¶ 2-4 and 12 of its Statement of Facts, the MBTA inaccurately characterizes the plaintiff's various allegations against it. The following are the actual factual and legal allegations asserted by the plaintiff (set forth here in essentially identical form to that set forth in Plaintiff's Opposition):

> 1.   While on MBTA Train P514 (which was crewed by Amtrak personnel), "Dr. Allen began to gasp and make raspy, snore-like sounds drawing the attention of several passengers. Within moments, Dr. Allen slumped sideways with his head and shoulders over the armrest into the aisle. A nearby passenger immediately checked on him while another flagged down an Amtrak assistant conductor. As the assistant

conductor arrived, another passenger checked and found Dr. Allen's skin purplish and clammy." (*See* Complaint, p. 2 at ¶ 7, attached to Plaintiff's Opposition as **Exhibit B**).

      2.     "A fellow passenger with a medical doctor's degree arrived ... asking the Amtrak personnel if 911 had yet been called, [and] at about 8:53 a.m., the doctor immediately began cardiopulmonary resuscitation ... Two Amtrak assistant conductors were present when it was clearly stated that Dr. Allen had no pulse, was not breathing and was, therefore, critically ill." (**Exhibit B**, Complaint, p. 2 at ¶ 8; Deposition of Jeanne E. Hathaway, M.D., pp. 33-34 attached to Plaintiff's Opposition as **Exhibit C**).

      3.     "CPR was ongoing when the train pulled into Auburndale station ... at about 8:54 a.m. ... More than one passenger offered to call 911 for the crew, but were told: 'we've got it.' As commuters boarded at Auburndale, the crew decided that the train would proceed to Back Bay located four stations, and nearly twenty minutes, away." (**Exhibit B**, Complaint, p. 2 at ¶ 9; Deposition of James A. Peros, pp. 38-39, attached to Plaintiff's Opposition as **Exhibit D;** Witness Statement of Dale H. Boam, p. 3 attached to Plaintiff's Opposition as **Exhibit E**).

      4.     "Newton-Wellesley Hospital ... is located one mile from the Auburndale station and is about one minute away by ambulance. Newton Fire Station No. 2 is located less than six-tenths of a mile, or about forty-five seconds for an emergency vehicle, from the Auburndale station. Like all ambulances regularly serving NWH ... every Newton Fire Department emergency vehicle contained portable external defibrillation equipment. Between 8:40 a.m. and 9:05 a.m., rescue vehicles and personnel were in quarters ... and were available to respond if called. Despite this, Train P514 departed Auburndale at about 8:56 a.m." (**Exhibit B**, Complaint, p. 2 at ¶ 10).

      5.     "It was not until the train was stopped at Auburndale that Amtrak's lead conductor arrived at the scene to evaluate the emergency. When challenged by passengers as to why they were not awaiting medical assistance, the conductor inaccurately stated that emergency personnel could not access the station ... As the train departed Auburndale, the crew had still made no attempt to contact emergency medical services or to even report the situation as an emergency ..." (**Exhibit B**, Complaint, pp. 2-3 at ¶ 11). In fact, through discovery it has since been learned that even though he was aware of the emergency by Auburndale, in violation of all safety and emergency regulations including the MBTA Plan upon which the MBTA bases its motion, the conductor actually did not show up to evaluate the emergency for himself until much later, either at or shortly before the West Newton Station. (*See* **Exhibit D**, Depo. of J. Peros, pp. 15-20, 39).

      6.     "As Train P514 proceeded on its usual schedule from Auburndale to West Newton, Amtrak's lead conductor was observed casually collecting tickets from seatbacks. It was not until the train slowed for its scheduled stop at West Newton, minutes later, that the engineer reached CSX dispatch in Albany, New York, to advise,

incorrectly, that: 'Our conductor's got a passenger who has apparently passed out, he's breathing, but passed out.  We need medical attention at Back Bay station.'  ... Neither the conductor nor the engineer declared an emergency as provided for under all standard railroad operating rules or under the operating rules of either the MBTA or Amtrak.  The train crew made no attempt to make direct, local contact with Amtrak, the MBTA, EMS or 911." (**Exhibit B**, Complaint, p. 3 at ¶ 12).

7.   "As Train P514 slowed to a stop at West Newton, another passenger challenged the lead conductor and demanded to know why, if they had to proceed to Back Bay, they were still stopping for passengers instead of going straight through.  The conductor responded, 'What about the people on the platform?' and dismissed the passenger, telling him to 'take it up with the T.'  Passengers looked on in disbelief as the crew made yet another routine stop to disembark and board commuters.  Many on board began yelling at the crew to do something." (**Exhibit B**, Complaint, p. 3 at ¶ 14; Witness Statement of Kirsten N. Hano, pp. 2-3 attached to Plaintiff's Opposition as **Exhibit F**).

8.   "Newton Police Headquarters is located about two hundred yards from the MBTA's West Newton commuter rail station.  A portable, Automated External Defibrillator ('AED') was available in or near the Police Station's front lobby.  All Newton police vehicles were equipped with AEDs.  ... Despite this, Train P514 pulled out of West Newton at 9:00:41 a.m." (**Exhibit B**, Complaint, p. 3 at ¶ 15).

9.   "Within about thirty seconds after departing West Newton, a young man trained as an ... EMT ... arrived to assist in providing CPR to Dr. Allen.  The young man urgently instructed the crew to call ahead and have paramedics waiting at Newtonville, the next stop, but when the conductor responded that they could not and that it would somehow be faster to have paramedics waiting at Back Bay, the young man told him to make certain they were routed express.  None of these instructions were heeded." (**Exhibit B**, Complaint, p. 3 at ¶ 16; **Exhibit E,** Statement of D. Boam, pp. 7-8).

10.  "Shortly after the train departed West Newton, another concerned passenger followed a male crew member through a car demanding to know what they were doing and seeking assurances that, if they had to proceed to Back Bay, the train would make no further stops en route.  When the conductor asked the passenger why, the man explained in disbelief the seriousness of Dr. Allen's medical situation and that he would die if the crew continued to stop for passengers.  The conductor promised that no more stops would be made.  The train then made yet another routine stop for passengers at the Newtonville station at 9:02:39 a.m." (**Exhibit B**, Complaint, p. 4 at ¶ 17; Witness Statement of Jennifer L. Houghton, pp. 2-3 attached to Plaintiff's Opposition as **Exhibit G**).

11.  "Newton Fire Station No. 4 is located less than one-half mile from the Newtonville station and is staffed with rescue personnel and paramedics who were in

quarters at 9:00 a.m. on July 30, 2002.  Travel time from the firehouse to the MBTA's Newtonville station is approximately 45 seconds." (**Exhibit B,** Complaint, p. 4 at ¶ 18).

  12. "At about 9:15 a.m., Train P514 pulled into Back Bay station.  ... James Allen was declared dead at 10:14 a.m." (**Exhibit B,** Complaint, p. 4 at ¶ 19).

  13. "At the time of Dr. Allen's collapse and cardiopulmonary resuscitation, it was or should have been clear to the train's crew that Dr. Allen needed emergency medical services, including defibrillation and advanced life support, and that such services were readily available near the three rail stations at which the train stopped immediately after Dr. Allen's collapse.  As a result of the gross negligence, recklessness and unfair acts and practices of the defendants, the crew failed to immediately contact emergency services, failed to report the emergency in a timely manner, and failed to access available emergency services at various stops along the route.  Had the defendants satisfied their duty of care to Dr. Allen, he would have recovered from this incident and resumed his regular activities; instead, the decedent died as a result of the negligence, gross negligence and violations of Mass. Gen. L. c. 93A on the part of the defendants, their employees and agents." (**Exhibit B,** Complaint, p. 4 at ¶ 20).

  14. "The defendants, their employees and agents were negligent on, and prior to, July 30, 2002 with respect to the operation of the MBTA commuter rail system by, among other things, failing to take reasonable steps in response to Dr. Allen's need for emergency services, failing to have and follow adequate emergency and communications procedures and failing to properly train their personnel." (**Exhibit B,** Complaint, p. 5 at ¶ 23).

  15. "The defendants violated the Massachusetts Consumer Protection Act, Mass. Gen. L. c. 93A, with respect to the operation, control and provision of services on and for the MBTA commuter rail system on, and prior to July 30, 2002, by, among other things, violating safety rules and regulations intended to protect consumers and failing to develop, institute and implement proper emergency medical procedures and preparedness training." (**Exhibit B,** Complaint, p. 6, ¶ 31).

(5-9) The MBTA's recitation of portions of the Federal Railroad Safety Act, 49 U.S.C. § 20106 and certain regulations promulgated thereunder at 49 C.F.R. §§ 239 *et seq.* are not "material facts of record," but neither are they accurately or completely set forth.  While the MBTA asserts in its Memorandum at pp. 5-6 (although not at ¶¶ 10 or 11 of its Statement of Facts) that "evidence on discovery showed an emergency passenger preparedness plan was

adopted under FRA regulatory requirements and is followed by the MBTA," the MBTA has failed to present or cite to that "evidence on discovery" in its filings.

At most, the MBTA Plan establishes certain "minimum actions" (*See* MBTA Plan, § 1.1 attached to Plaintiff's Opposition as **Exhibit L**).  By its terms, the MBTA Plan does not limit or prevent the railroad from providing additional services, as contemplated by FRSA, which "does not restrict railroads from adopting and enforcing additional or more stringent requirements not inconsistent with this part." *Id. See also*  49 C.F.R. § 239.1.  The Plan's terms disclose that it is primarily aimed at crashes and similar accidents. (**Exhibit L**, MBTA Plan, § 6.1.3.3).  The MBTA Plan does not address, much less "substantially subsume," plaintiff's claims that "emergency medical services, including defibrillation and advanced life support ... were readily available near the three rail stations at which the train stopped immediately after Dr. Allen's collapse" and that "the crew failed to ... access available emergency services at various stops along the route." (**Exhibit B** to Plaintiff's Opposition, Complaint, p. 4 at ¶ 20).

(10)    At ¶ 10 of its Statement of Facts, the MBTA asserts that it "adopted a ... [Plan] under FRA regulatory requirements in 1998."  However, 49 C.F.R. § 239 does not provide for the railroad to "adopt" an emergency plan, it requires that the railroad  "file" and obtain "written" "approval" of a "jointly adopt[ed]" plan with the "hosting" railroad (in this case, CSX) over which its passenger train was traveling. (*See* Deposition of Amtrak by Larry R. Beard, Director - Office of Emergency Preparedness, pp. 25, 43-47, 53-58 attached to plaintiff's Opposition as **Exhibit M**).  The MBTA has failed or refused to produce any of the documentation specifically required under 49 C.F.R. § 239.201 showing that the MBTA Plan was ever, in fact, filed with, and approved by, the FRA. (*See* MBTA's Response No. 43 to Documents Requests attached as

**Exhibit H**; MBTA's Supplemental Response No. 43 attached as **Exhibit I**). While the regulations upon which the MBTA relies specifically call for written approvals of the plans submitted, despite plaintiff's repeated requests and a Court Order that the MBTA produce such relevant documents, the MBTA has failed or refused to produce *any* documentation between it and the FRA showing that its plan has ever been filed or approved. *Id.* The MBTA's only factual explanation, which directly contradicts the requirements of § 239.201, is "that's how they [at the FRA] do it." (*See* Rule 30(b)(6) Deposition of MBTA by Anna M. Barry, pp. 165-168 attached to Plaintiff's Opposition as **Exhibit J**).

Furthermore, in its Memorandum at p. 6 (although, again, nowhere in its Statement of Facts), the MBTA makes the factual assertion that the "training required by the plan was given to employees." While the MBTA assertion contains no citation to page numbers, quotations or other identifiable references, it claims that Amtrak's Michael O'Malley testified that the "training required was given to employees." (Defendant's memo., p. 6.) However, Mr. O'Malley testified that he did not "believe that engineers and conductors were briefed specifically on either an intercity [i.e., Amtrak] or a commuter rail [i.e., MBTA] emergency response plan .... [but rather] the training was general at that level." (*See* Deposition of Michael O'Malley, pp. 26-27, attached to MBTA's Memo. as Exhibit 5). More importantly, when the same questions were asked of Amtrak's "Senior Instructor for Training," Daniel R. Peters, who was specifically responsible for training the conductors, he testified as follows:

> Q. Have you even heard of or seen the MBTA emergency plan?
> A. I only saw the plan after the incident.
> Q. Were you ever -- did you ever instruct based upon what was contained in the MBTA emergency plan?
> A. I did not.
> Q. Were you ever asked to or required to, as far as you know, instruct any of your

        crews on what was contained in the MBTA emergency plan?
A.    I was not.
Q.    Do you have any idea why the MBTA had an emergency plan?
A.    I have no idea.

(Rule 30(b)(6) Deposition of Amtrak by D. Peters, pp. 12-13, 112-115 attached to plaintiff's Opposition as **Exhibit N**).

In short, not only has the MBTA failed to set forth and support its factual assertions with respect to its Plan as required by Fed. R. Civ. P. 56 and Local Rule 56.1, but such assertions are inaccurate, incomplete or simply untrue and certainly not "undisputed."

        Respectfully submitted,
        Plaintiff, Marlene V. Allen, Executrix of the
        Estate of James R. Allen, Ph.D.
        By Her Attorneys,

        /s/ Bradley M. Henry
        _____
        Leo V. Boyle, BBO No. 052700
        Michael B. Bogdanow, BBO No. 544174
        Bradley M. Henry, BBO No. 559501
        MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.
        Two Center Plaza, Suite 600
        Boston, MA  02108-1922
        (617) 523-8300

**CERTIFICATE OF SERVICE**

    I, Bradley M. Henry, hereby certify that on this 15th day of July 2005, I served the foregoing PLAINTIFF'S CONCISE STATEMENT OF DISPUTED FACTS IN OPPOSITION TO THE SUMMARY JUDGMENT MOTION OF THE DEFENDANT MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, by electronic filing and by mailing an exact copy thereof, via first class mail postage prepaid to all counsel of record:  Michael J. McCormack, Esq. and David T. Mitrou, Esq., McCormack & Epstein, 1 International Place - 7th Floor, Boston, MA 02110; William J. Dailey, Jr., Esq. and Harry A. Pierce, Esq., Sloan and Walsh, Three Center Plaza, Boston, MA 0210; Michael B. Flynn, Esq. and Richard A. Davidson, Jr., Esq., Flynn & Associates, P.C., 400 Crown Colony Drive, Ste. 200, Quincy, MA 02169.

        /s/ Bradley M. Henry
        _____
        Bradley M. Henry