UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARLENE V. ALLEN, Executrix of the Estate of James R. Allen, Ph.D.,<br>　　　　　　　　　　Plaintiff,<br>v.<br>MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, NATIONAL RAILROAD PASSENGER SERVICE (a/k/a "AMTRAK") and CSX TRANSPORTATION, INC.,<br>　　　　　　　　　　Defendants. | CIVIL ACTION<br>NO: 04-12080-PBS |

**PLAINTIFF'S OPPOSITION TO MOTION OF THE
DEFENDANT NATIONAL RAILROAD PASSENGER SERVICE
(a/k/a "AMTRAK") FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Marlene V. Allen, Executrix of the Estate of James R. Allen, Ph.D., hereby files her opposition to the motion of defendant National Railroad Passenger Service ("Amtrak") for partial summary judgment. As grounds for this opposition, plaintiff states that Amtrak has failed to satisfy its burden of proving that it is immune from liability under Mass. Gen. L. ch. 93A.

**BACKGROUND**

This case arises out of the July 30, 2002 death of plaintiff's decedent, James R. Allen, Ph.D. ("Dr. Allen") who suffered a cardiac arrest onboard an MBTA commuter train operated by Amtrak which would not stop for medical assistance but, instead, continued to board and disembark passengers at three station stops over more than twenty minutes. The plaintiff alleges, *inter alia*, that:

In 1995 and continuing through 2002, the defendant Amtrak was party to a commercial transportation services contract entitled the "Operating Agreement Between [the MBTA] and [Amtrak]" which provided that, for an "annual fixed price" as well as for separate "Charges for

Additional or Modified Services" and for "Charges for Extra Work" and for separate "Performance Incentive Payments," Amtrak would provide personnel to operate certain aspects of the MBTA Commuter Rail Service. (*See* "Operating Agreement Between [the MBTA] and [Amtrak]," pp. 26-31 attached in pertinent part as **Exhibit A - Amtrak**.)

As set forth in more detail below, Amtrak personnel were serving as the train crew onboard MBTA Train P514 on the date of the incident. Notwithstanding Amtrak's characterization (at pp. 2-3 and 7-9 of Amtrak's Memo.) of what the plaintiff did allege, or even may have "meant to" allege, against it, with respect to the facts of that incident, plaintiff has actually alleged the following:[1]

> 1.  While on MBTA Train P514 which was crewed by Amtrak personnel, "Dr. Allen began to gasp and make raspy, snore-like sounds drawing the attention of several passengers. Within moments, Dr. Allen slumped sideways with his head and shoulders over the armrest into the aisle. A nearby passenger immediately checked on him while another flagged down an Amtrak assistant conductor. As the assistant conductor arrived, another passenger checked and found Dr. Allen's skin purplish and clammy." (*See* Complaint, p. 2 at ¶ 7, attached to as **Exhibit B** to Plaintiff's Opposition to the Motion for Summary Judgment of the MBTA, hereinafter "the MBTA Motion").

> 2.  "A fellow passenger with a medical doctor's degree arrived ... asking the Amtrak personnel if 911 had yet been called, [and] at about 8:53 a.m., the doctor immediately began cardiopulmonary resuscitation ... Two Amtrak assistant conductors were present when it was clearly stated that Dr. Allen had no pulse, was not breathing and was, therefore, critically ill." (**Exhibit B**, Complaint, p. 2 at ¶ 8; Deposition of Jeanne E. Hathaway, M.D., pp. 33-34 attached as **Exhibit C** to Plaintiff's Opposition to the MBTA Motion).

> 3.  "CPR was ongoing when the train pulled into Auburndale station ... at about 8:54 a.m. ... More than one passenger offered to call 911 for the crew, but were told: 'we've got it.' As commuters boarded at Auburndale, the crew decided that the train

---

[1] Insofar as many, if not most of these factual allegations are identical to those submitted by plaintiff in her Opposition to the motion for summary judgment filed by the MBTA, in the interests of efficiency and conservation of paper, plaintiff incorporates by reference her **Exhibits B-G** attached to that Opposition and only attaches hereto those additional exhibits that apply uniquely to Amtrak's motion. For the sake of continuity, the exhibits attached hereto will follow the same lettering pattern.

would proceed to Back Bay located four stations, and nearly twenty minutes, away."
(**Exhibit B**, Complaint, p. 2 at ¶ 9; Deposition of James A. Peros, pp. 38-39, attached as
**Exhibit D** to Plaintiff's Opposition to the MBTA Motion; Witness Statement of Dale H.
Boam, p. 3 attached as **Exhibit E** to Plaintiff's Opposition to the MBTA Motion).

      4.     "Newton-Wellesley Hospital ... is located one mile from the Auburndale station and is about one minute away by ambulance. Newton Fire Station No. 2 is located less than six-tenths of a mile, or about forty-five seconds for an emergency vehicle, from the Auburndale station. Like all ambulances regularly serving NWH ... every Newton Fire Department emergency vehicle contained portable external defibrillation equipment. Between 8:40 a.m. and 9:05 a.m., rescue vehicles and personnel were in quarters ... and were available to respond if called. Despite this, Train P514 departed Auburndale at about 8:56 a.m." (**Exhibit B**, Complaint, p. 2 at ¶ 10).

      5.     "It was not until the train was stopped at Auburndale that Amtrak's lead conductor arrived at the scene to evaluate the emergency.[2] When challenged by passengers as to why they were not awaiting medical assistance, the conductor inaccurately stated that emergency personnel could not access the station ... As the train departed Auburndale, the crew had still made no attempt to contact emergency medical services or to even report the situation as an emergency ..." (**Exhibit B**, Complaint, pp. 2-3 at ¶ 11).

      6.     "As Train P514 proceeded on its usual schedule from Auburndale to West Newton, Amtrak's lead conductor was observed casually collecting tickets from seat-backs. It was not until the train slowed for its scheduled stop at West Newton, minutes later, that the engineer reached CSX dispatch in Albany, New York, to advise, incorrectly, that: 'Our conductor's got a passenger who has apparently passed out, he's breathing, but passed out. We need medical attention at Back Bay station.' ... Neither the conductor nor the engineer declared an emergency as provided for under all standard railroad operating rules or under the operating rules of either the MBTA or Amtrak. The train crew made no attempt to make direct, local contact with Amtrak, the MBTA, EMS or 911." (**Exhibit B**, Complaint, p. 3 at ¶ 12).

      7.     "As Train P514 slowed to a stop at West Newton, another passenger challenged the lead conductor and demanded to know why, if they had to proceed to Back Bay, they were still stopping for passengers instead of going straight through. The conductor responded, 'What about the people on the platform?' and dismissed the passenger, telling him to 'take it up with the T.' Passengers looked on in disbelief as the

---

[2] In fact, through discovery it has since been learned that even though he was aware of the emergency at or before Auburndale, in violation of all safety and emergency regulations including the Emergency Preparedness Plan upon which the MBTA bases its motion, the conductor actually did not show up to evaluate the emergency for himself until much later, either at or shortly before the West Newton Station. (*See* **Exhibit D**, Depo. of J. Peros, pp. 15-20, 39).

crew made yet another routine stop to disembark and board commuters. Many on board began yelling at the crew to do something." (**Exhibit B**, Complaint, p. 3 at ¶ 14; Witness Statement of Kirsten N. Hano, pp. 2-3 attached as **Exhibit F** to Plaintiff's Opposition to the MBTA Motion).

8. "Newton Police Headquarters is located about two hundred yards from the MBTA's West Newton commuter rail station. A portable, Automated External Defibrillator ('AED') was available in or near the Police Station's front lobby. All Newton police vehicles were equipped with AEDs. ... Despite this, Train P514 pulled out of West Newton at 9:00:41 a.m." (**Exhibit B**, Complaint, p. 3 at ¶ 15).

9. "Within about thirty seconds after departing West Newton, a young man trained as an ... EMT ... arrived to assist in providing CPR to Dr. Allen. The young man urgently instructed the crew to call ahead and have paramedics waiting at Newtonville, the next stop, but when the conductor responded that they could not and that it would somehow be faster to have paramedics waiting at Back Bay, the young man told him to make certain they were routed express. None of these instructions were heeded." (**Exhibit B**, Complaint, p. 3 at ¶ 16; **Exhibit E,** Statement of D. Boam, pp. 7-8).

10. "Shortly after the train departed West Newton, another concerned passenger followed a male crew member through a car demanding to know what they were doing and seeking assurances that, if they had to proceed to Back Bay, the train would make no further stops en route. When the conductor asked the passenger why, the man explained in disbelief the seriousness of Dr. Allen's medical situation and that he would die if the crew continued to stop for passengers. The conductor promised that no more stops would be made. The train then made yet another routine stop for passengers at the Newtonville station at 9:02:39 a.m." (**Exhibit B**, Complaint, p. 4 at ¶ 17; Witness Statement of Jennifer L. Houghton, pp. 2-3 attached as **Exhibit G** to Plaintiff's Opposition to the MBTA Motion).

11. "Newton Fire Station No. 4 is located less than one-half mile from the Newtonville station and is staffed with rescue personnel and paramedics who were in quarters at 9:00 a.m. on July 30, 2002. Travel time from the firehouse to the MBTA's Newtonville station is approximately 45 seconds." (**Exhibit B,** Complaint, p. 4 at ¶ 18).

12. "At about 9:15 a.m., Train P514 pulled into Back Bay station. ... James Allen was declared dead at 10:14 a.m." (**Exhibit B**, Complaint, p. 4 at ¶ 19).

13. "At the time of Dr. Allen's collapse and cardiopulmonary resuscitation, it was or should have been clear to the train's crew that Dr. Allen needed emergency medical services, including defibrillation and advanced life support, and that such services were readily available near the three rail stations at which the train stopped immediately after Dr. Allen's collapse. As a result of the gross negligence, recklessness and unfair acts and practices of the defendants, the crew failed to immediately contact emergency services, failed to report the emergency in a timely manner, and failed to

access available emergency services at various stops along the route.  Had the defendants satisfied their duty of care to Dr. Allen, he would have recovered from this incident and resumed his regular activities; instead, the decedent died as a result of the negligence, gross negligence and violations of Mass. Gen. L. c. 93A on the part of the defendants, their employees and agents." (**Exhibit B,** Complaint, p. 4 at ¶ 20).

14.  "The defendants [including specifically, Amtrak], their employees and agents were negligent on, and prior to, July 30, 2002 with respect to the operation of the MBTA commuter rail system by, among other things, failing to take reasonable steps in response to Dr. Allen's need for emergency services, failing to have and follow adequate emergency and communications procedures and failing to properly train their personnel." (**Exhibit B,** Complaint, p. 5 at ¶ 23).

15.  "The defendants violated the Massachusetts Consumer Protection Act, Mass. Gen. L. c. 93A, with respect to the operation, control and provision of services on and for the MBTA commuter rail system on, and prior to July 30, 2002, by, among other things, violating safety rules and regulations intended to protect consumers and failing to develop, institute and implement proper emergency medical procedures and preparedness training." (**Exhibit B,** Complaint, p. 6, ¶ 31).

Apart from the factual allegations and support set forth above, facts relating to Amtrak's role in the transportation marketplace in Massachusetts as of June 2002 are highly relevant to Amtrak's motion, if not significantly in dispute.  For example, the Amtrak - MBTA Commuter Rail contract which expired in 2003, was in the top two or three largest commuter service contracts entered into by Amtrak in the nation. (*See* Deposition of Amtrak by Larry R. Beard, Director - Office of Emergency Preparedness, pp. 37-41 attached hereto as **Exhibit H - Amtrak**).

While Amtrak, thus far, has resisted producing certain financial documents which remain subject to ongoing discovery dispute consultations, there are a number of sources in the public domain which underscore the financial and commercial significance of Amtrak's contract with the MBTA.  For example, according to the United Transportation Union (the labor union to which the Amtrak train conductors this case belongs), when Amtrak opted not to renew its contract with the MBTA, Amtrak:

> "end[ed] its most lucrative commuter rail contract in the nation ... handing the tracks and some 1,600 union workers, to one of three [other private] companies positioned to bid on the the estimated $150 million-a-year, five year deal."

(*See* "Amtrak Passess on MBTA Contract Renewal," United Transportation Union News, Aug. 2, 2002, at p. 1, attached hereto as **Exhibit I - Amtrak**).  The article went on to say that, in 2000, Amtrak was outbid in a competitive bid by another corporation, Bay State Transit, to maintain the MBTA's commuter rail system rails and equipment. (*Id.* at p. 2).  It went on to state that Amtrak President, David L. Gunn, had listed 10 new stipulations in the MBTA's new "commuter rail contract that would differ substantially from the contract Amtrak [then held], reaping about $180 million a year." (*Id.* at p. 2).  It concluded by noting that one reason Amtrak opted not to renew its contract with the MBTA was that "the new contract would virtually eliminate incentives for on-time performance and fare collection – currently worth $130,000 a month to Amtrak – and replace it with 13 different penalties. (*Id.*). *See also* "Gunn Turns Down MBTA," Freedom Newsletter at pp. 1-2 (www.nationalcorridors.org) attached hereto as **Exhibit J - Amtrak**) (same); "Amtrak Pullout A Pioneer Victory," Pioneer Institute for Public Policy, p. 1 (www.pioneerinstitute.org) attached hereto as **Exhibit K - Amtrak)**.

There is little question that, at the time of Dr. Allen's death, Amtrak's contract with the MBTA was "one of the most lucrative real deals in the country" and was valued at almost $1 billion over a five year span. ("T Rail Choice Seen As Early as Next Week," Boston Globe, Dec. 4, 2002 attached as **Exhibit L - Amtrak**).  All such facts are relevant to the disputed issue of whether Amtrak was operating and, if so, to what extent, in the rail transportation marketplace in Massachusetts at the time of the decedent's death.

Amtrak contends that it is not engaged in trade and commerce, and that, therefore, Mass. Gen. L. c. 93A is not applicable and Count Three should be denied. On the contrary, Amtrak has failed to satisfy its burden of proving that it is immune from liability under c. 93A.

## ARGUMENT

I.     Amtrak Is Subject To Liability Under Mass. Gen. L. c. 93A.

Amtrak's entire premise is that the case law protecting ***governmental entities*** from Chapter 93A liability is also applicable to claims against Amtrak, and Amtrak's argument relies exclusively on Chapter 93A cases against governmental entities. The cases cited by Amtrak do not apply to claims against Amtrak. In each case, a c. 93A claim against a governmental entity was dismissed because the governmental entity was not acting in a "business context." *Boston Housing Authority v. Howard,* 427 Mass. 537, 539 (1998); *Lafayette Place Associates v. Boston Redevelopment Authority,* 427 Mass. 509, (1998) (Boston Redevelopment Authority was not acting in business context when involved in urban renewal); *JBL Bus Co. v. MBTA,* 2001 Mass. Super. LEXIS 372 (2001) (MBTA was not acting in business context when settling claims involved in the allocation of commuter rail service between public and private entities); C*ity Water Taxi Corp. v. Mass. Port Auth.*, 15 Mass. L. Rep. 494, 2002 Mass. Super. LEXIS 482 (2002) (governmental entity was not acting in "business context" when charging fees and tolls). In each of these cases, the premise for asserting the defense was the fact that the defendant was a governmental entity. None of these claims would have been dismissed if the respective defendant had been a private entity, and Amtrak does not contend otherwise.

For purposes of its liability for accidents caused by its misconduct, Amtrak has never been afforded the governmental immunity it seeks in its motion for summary judgment. In fact, Amtrak has often asserted (successfully) that it is not a governmental entity, and may be "hoisted

on its own petard,"[3] for it has moved for summary judgment - successfully - on the grounds that it is "not an 'agency' of the federal government." *Ehm v. National Railroad Passenger Corp.,* 732 F.2d 1250, 1252 (5th Cir. 1984) (Privacy Act is inapplicable to Amtrak because it is not an agency of the government). As stated in *Ehm*, the statute authorizing Amtrak "specifically provides that Amtrak 'will not be an agency or establishment of the United States Government.' 45 U.S.C. § 541." *Id.* Moreover, Amtrak is not even a governmentally controlled entity, for "Amtrak's day-to-day operations are not subject to close government supervision. The officers and employees who conduct Amtrak's day-to-day affairs are not federal employees." *Id.*, 732 F.2d at 1255. Amtrak succeeded in establishing that, as a matter of law, it is not a governmental agency, nor under any governmental control. Amtrak cannot now seriously contend that it is a governmental entity for purposes of Chapter 93A. It simply cannot have it both ways.

On the other hand, when, as in the present case, Amtrak has taken the opposite position - that is, that it is immune from liability because it is a governmental entity - that position has been rejected by the courts. In *Riddle v. National Railroad Passenger Corp.,* 831 F. Supp. 442, 445 (E.D. Penn. 1993), Amtrak sought the application of "official immunity" based on its contention that it is a "governmental entity subject to the protections of immunity from suit." The court rejected Amtrak's contention. Based in part on the express terms of the enabling statute that Amtrak "will not be an agency, instrumentality, authority or entity or establishment" of the government., the court treated it as a private entity that is not entitled to governmental immunity from liability. *Id.*

---

[3] *See Courtney v. La Salle Univ.*, 124 F.3d 499, 508 (3d Cir. 1997) (Becker, J., concurring) (litigant "may be hoisted on its own petard" based on previous position asserted).

A careful review of the situations in which doctrines intended for governmental entities are applied to Amtrak, and those situations in which they are not, is dispositive of Amtrak's motion and shows that it can be held liable under c. 93A. In *Sentner v. Amtrak,* 540 F. Supp. 557, 558 (D. N.J. 1982), the plaintiff sought punitive damages against Amtrak for severe personal injuries sustained as a result of Amtrak's "gross, wanton and reckless negligence." Amtrak contended that it could not be liable for such damages because it was "an instrumentality of the United States government and therefore insulated from punitive civil judgments." *Id.* As in the other cases addressing this issue, the court rejected this argument, in part based on the fact that "despite numerous amendments to and extensions of the original Act, Congress has not altered the fundamental character of Amtrak as a non-governmental entity, specifically a 'mixed ownership' corporation ... to be operated for profit under the provisions of the District of Columbia Business Corp. Act." *Id.*, 540 F. Supp. at 560. The court recognized that in other cases in which Amtrak had "sought to arrogate to itself the fiscal protection afforded when an entity is recognized as an instrumentality of the United States government," such attempts have been "flatly rejected," for Amtrak "'is a private corporation operated for profit'" whose "'position is no different than that of any private corporation organized under federal law.'" *Id.*, 540 F. Supp. at 560, citing *N.R.P.C. v. Miller,* 358 F. Supp. 1321 (D. Kan.) (three judge court), aff'd, 414 U.S.948 (1973).

While governmental entities are generally immune from punitive damages, Amtrak is not entitled to such immunity, for it is not a governmental entity. In addition, the purpose of punitive damages, somewhat akin to the purpose of liability under Chapter 93A, provides an additional reason for not extending the governmental protection to Amtrak. "Moreover, the legislative history indicated that Congress wanted to secure Amtrak's vigilance in protecting passengers

from accidents by exposing Amtrak to liability for punitive damages." *Sparkman v. Sparkman,* 703 F. 2d 1097, 1101 n. 3 (9th Cir. 1983). *Id.* As stated in *Sentner v. Amtrak, supra*, 540 F. Supp. at 561,

> Congress must certainly have decided that the threat of punitive liability would aid the paramount purpose of securing the utmost vigilance by Amtrak in protecting those who commit themselves to its carriage. Regardless of the source from which any punitive damages might ultimately be paid, such liability is calculated to sensitize Amtrak's managers and the corporation's controlling interests, whether they be private or public, to the requirement of maintaining adequate standards of safety. To the extent that the United States Treasury bears the expense of punitive liability for any misdeed by Amtrak, the taxpayers may at least be assured that the Congressional overseers and publically appointed managers of Amtrak will be compelled by fiscal and political pressures to corrective action so as to prevent future injuries.
>
> Congress chose not to make Amtrak a government entity, leaving it exposed to punitive liability, and thereby structuring a disincentive to dangerous misoperation. ...
>
> Defendant argues strenuously that no statutory indication can be found of the United States government's consent to be exposed to punitive liability. As noted previously, however, the need for such consent only arises with respect to government agencies and instrumentalities, which, it is decided, Amtrak is not.

In sum, the cases involving issues analogous to the applicability of Chapter 93A explicitly conclude that Amtrak should be treated as a private entity. As a private entity, Amtrak cannot reasonably contend that its operation of a train does not constitute trade or commerce. On the contrary, the operation of a train clearly constitutes trade or commerce. *Sentner*, *supra*, 540 F. Supp. at 560. See also *United Transp. Union v. Foster*, 205 F.3d 851, 862 (5th Cir. 2000) (implicit assumption that transportation of passengers involves commerce, as the only question regarding the state's right to regulate such commerce was whether it would place an "undue burden on *interstate* commerce") (emphasis supplied). Only when the train is conducted by the

government is it even arguable - although not free from doubt[4] - that the conduct could be viewed as outside traditional notions of "trade or commerce."

Amtrak relies extensively on one case in which its own request to be viewed as non-governmental was rejected. However, that case, *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 383 (1995), fully supports the application of Chapter 93A to Amtrak. *Lebron* involved claims arising out of Amtrak's refusal to display an advertisement critical of the Coors Beer family, and the Supreme Court concluded that Amtrak had a sufficient nexus with the government so that Amtrak could be "regarded as a Government entity for First Amendment purposes." Amtrak had argued that "its charter's disclaimer of agency status prevents it from being considered a Government entity." 513 U.S. at 392. Citing with approval the *Sentner v. Amtrak* decision discussed above which denied Amtrak an affirmative defense afforded to governmental entities, the Supreme Court accepted the proposition that the "statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit." *Id.* However, the Court rejected Amtrak's assertion that the statute was determinative of its status "for purposes of determining the constitutional rights of citizens affected by its actions." *Id.* The *Sentner* decision exposed Amtrak to liability for punitive damages as a non-governmental entity, and the *Lebron* decision afforded the public the right of free speech when dealing with Amtrak. Nothing in the *Lebron* decision implied that consumer protection laws were inapplicable to Amtrak, and, on the contrary, the Supreme Court's recognition that Amtrak is not protected by sovereign immunity would imply that such laws are applicable.

---

[4] "Whether a governmental entity is ever amenable to suit under c. 93A remains an open issue." *M. O'Connor Contr., Inc. v. City of Brockton*, 61 Mass. App. Ct. 278, 284 (2004).

Amtrak contends that it has never been held liable under Chapter 93A or similar laws, but Amtrak has offered no case law in which it has been held immune from such liability, and the cases discussed above show that under analogous circumstances, it has been held liable. Moreover, the closest case to at least indirectly address this issue provides strong support for the proposition that Amtrak can be held liable under Chapter 93A. In *M. O'Connor Contr., Inc. v. City of Brockton*, 61 Mass. App. Ct. 278 (2004), the court vacated an award of punitive damages against the City of Brockton.  The "claim against the city arose from its performance of a governmental function, i.e., contracting for the construction of a municipal building to be used solely for municipal purposes." 61 Mass. App. Ct. at 285. Recognizing that the issue of whether a governmental entity could be liable under c. 93A was still an open issue, the court held that multiple damages under Chapter 93A could not be awarded against the municipality because "the award was one for punitive damages ... a form of relief particularly disfavored when assessed against a public entity ... an award of double damages against a municipality" is "in contravention of well-established principles of sovereign immunity..." 61 Mass. App. Ct. at 285-86.

As discussed above, sovereign immunity does not apply to Amtrak, punitive damages may be awarded against Amtrak, and, thus, the *M. O'Connor Contr., Inc.* Court's rationale for providing the government protection from Chapter 93A does not apply to Amtrak. While the government's consent to sue is an issue in the cases cited by Amtrak, "the need for such consent only arises with respect to government agencies and instrumentalities, which, it is decided, Amtrak is not." *Sentner*, 540 F. Supp. at 561. Amtrak may be held liable for its unfair acts or practices and its motion should be denied.

II.   <u>Amtrak's Attempt To Refute Allegations That Were Never Made By The Plaintiff Is Simply A Waste Of The Court's And The Parties' Time And Resources.</u>

The Plaintiff expressly alleged (Complaint, ¶¶ 20, 31) that:

> it was or should have been clear to the train's crew that Dr. Allen needed emergency medical services, including defibrillation and advanced life support, and that such services were readily available near the three rail stations at which the train stopped immediately after Dr. Allen's collapse. As a result of the ... unfair acts and practices of the defendants, the crew failed to immediately contact emergency services, failed to report the emergency in a timely manner, and failed to access available emergency services at various stops along the route ... the decedent died as a result of the ... violations of Mass. Gen. L. c. 93A on the part of the defendants, their employees and agents. ... The defendants violated the Massachusetts Consumer Protection Act, Mass. Gen. L. c. 93A, with respect to the operation, control and provision of services on and for the MBTA commuter rail system on, and prior to July 30, 2002, by, among other things, violating safety rules and regulations intended to protect consumers and failing to develop, institute and implement proper emergency medical procedures and preparedness training.

Moreover, for a passenger train service Conductor to utterly ignore his duties to Dr. Allen and the life-threatening emergency he faced while, at the same time, to respond to concerned passengers with comments like "What about the people on the platform?" and "take it up with the T" can hardly be said to be more "unfair." (**Exhibit B**, Complaint, p. 3 at ¶ 14; **Exhibit F**, Statement of K. Hano, pp. 2-3). As for violations of safety regulations, as already addressed at length in Plaintiff's Opposition to the MBTA's Motion for Summary Judgment (at pp. 17-18) which is applicable as well to Amtrak, plaintiff has already established that Amtrak violated nearly every aspect of the MBTA Emergency Preparedness Plan with respect to the conduct of the Conductor and his crew.

These allegations, if proven, will support a finding that Amtrak acted unfairly in its handling of James Allen's emergency, and in it preparation for - or failure to prepare for - this emergency. Amtrak does not contend otherwise; instead, it argues that it "is clear that the plaintiff has relied upon 940 C.M.R. § 3.16," then argues that Amtrak did not violate 940 C.M.R.

-13-

§ 3.16 and then concludes that because the plaintiff cannot sustain the allegations (that the plaintiff never made), summary judgment should enter. Amtrak's Memorandum of Law, p. 8.

It is difficult to even know how to respond to Amtrak's argument. Had the plaintiff intended to allege violations of 940 C.M.R. § 3.16, she would have done so. Violations of 940 C.M.R. § 3.16 are *per se* violations of Chapter 93A, but they are merely one type of violation of c. 93A. They are not the sole avenue for establishing c. 93A violations. Amtrak may or may not be correct in its assertion that it did not violate any express Massachusetts regulations. But that assertion is irrelevant. Amtrak cannot create an allegation the plaintiff never made, assert that the plaintiff made it, then refute it, and then obtain summary judgment based on that refutation.

The actual standard that the plaintiff must satisfy is not dependent upon 940 C.M.R. § 3.16. "What is unfair is a definitional problem of long standing, which statutory draftsmen have prudently avoided." *Levings v. Forbes & Wallace, Inc.,* 8 Mass App. Ct. 498, 504 (1979). In a business versus business case under c. 93A § 11, the "objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Id.* However, in a consumer versus business case under c. 93A § 9, such as the present litigation, the standard is lower, as a consumer "is not inured to the rough and tumble of the world of commerce." *Spence v. Boston Edison Co.*, 390 Mass. 604, 615 (1983). Thus, the present case requires a lesser showing of "rascality" than would a case brought under c. 93A § 11. *Id.* Accord *Madan v. Royal Indemnity Co.,* 26 Mass. App. 756, 763 n. 7 (1989) (claim under c. 93A § 11 judges the defendant "by a standard of unfairness higher than the standard employed" under c. 93A § 9). In any event, the "standard of behavior that falls within the ch. 93A proscription is notably imprecise" and focuses on whether Amtrak treated James Allen unfairly on the train. *St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis,* 262 F. 3d 53, 66 (1str Cir.

2001). Whether Amtrak's "conduct was unfair is a matter of fact" and the plaintiff "should have a chance to prove" her claim. *Spence*, 390 Mass. at 615.

In addition creating a standard that does not govern c. 93A, and to asking that the plaintiff refute allegations that she never made, Amtrak omitted important provisions of 940 C.M.R. § 3.16. Subparts (1) and (4) provide

> Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c.93A, § 2 if:
>
> (1) It is oppressive or otherwise unconscionable in any respect; or ...
>
> (4) It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2.

The acts alleged by the Plaintiff were oppressive in many respects. They violated regulations of the defendants, many of which the defendants themselves contend were enacted under the federal regulatory scheme.[5] In fact, Amtrak itself argues that "specific federal regulations govern emergency response procedures ... emergency equipment ... emergency response training ... to name a few." Amtrak's Memorandum of Law, p. 9. Thus, although the Plaintiff was not required to and did not allege violations of 940 C.M.R. § 3.16, the evidence of Amtrak's violations of c. 93A may include direct or implicit violations of § 3.16.

The evidence will support a finding that Amtrak's conduct in relation to James Allen was unfair, and, that James Allen died as a result of such conduct. Amtrak's motion for summary judgment should be denied.

---

[5] This argument is addressed in detail in the Plaintiff's Opposition to the MBTA's Motion for Summary Judgment.

## CONCLUSION

For the reasons addressed above, the plaintiff respectfully requests that the MBTA's motion for summary judgment be denied.

Respectfully submitted,
Plaintiff, Marlene V. Allen, Executrix of the
Estate of James R. Allen, Ph.D.
By Her Attorneys,


/s/ Bradley M. Henry
_____
Leo V. Boyle, BBO No. 052700
Michael B. Bogdanow, BBO No. 544174
Bradley M. Henry, BBO No. 559501
MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.
Two Center Plaza, Suite 600
Boston, MA  02108-1922
(617) 523-8300

**CERTIFICATE OF SERVICE**

I, Bradley M. Henry, hereby certify that on this 15th day of July 2005, I served the foregoing PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANT NATIONAL RAILROAD PASSENGER SERVICE FOR PARTIAL SUMMARY JUDGMENT, by electronic filing and by mailing an exact copy thereof, via first class mail postage prepaid to all counsel of record: Michael J. McCormack, Esq. and David T. Mitrou, Esq., McCormack & Epstein, 1 International Place - 7th Floor, Boston, MA 02110; William J. Dailey, Jr., Esq. and Harry A. Pierce, Esq., Sloan and Walsh, Three Center Plaza, Boston, MA 0210; Michael B. Flynn, Esq. and Richard A. Davidson, Jr., Esq., Flynn & Associates, P.C., 400 Crown Colony Drive, Ste. 200, Quincy, MA 02169.

_____
Bradley M. Henry