UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARLENE V. ALLEN, Executrix of the Estate of James R. Allen, Ph.D.,<br>    Plaintiff,<br>v.<br><br>MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, NATIONAL RAILROAD PASSENGER SERVICE (a/k/a "AMTRAK") and CSX TRANSPORTATION, INC.,<br>    Defendants. | CIVIL ACTION<br>NO: 04-12080-PBS |

**PLAINTIFF'S CONCISE STATEMENT OF DISPUTED
FACTS IN OPPOSITION TO THE MOTION FOR PARTIAL
SUMMARY JUDGMENT MOTION OF THE DEFENDANT
NATIONAL RAILROAD PASSENGER SERVICE ("AMTRAK")**

Pursuant to Rule 56.1 of this Court's Local Rules, the plaintiff, Marlene V. Allen, Executrix of the Estate of James R. Allen, Ph.D., files this concise statement of material facts of record as to which it is contended that there exist genuine issues to be tried.  By way of preface, this case arises out of the July 30, 2002 death of plaintiff's decedent, James R. Allen, Ph.D. ("Dr. Allen") who suffered a cardiac arrest onboard a Massachusetts Bay Transportation Authority ("MBTA") commuter train crewed by Amtrak personnel.  The Amtrak crew would not stop the train for medical assistance but, instead, continued to board and disembark passengers at three station stops over a period of more than twenty minutes.

**MATERIAL FACTS IN DISPUTE**

In 1995 and continuing through 2002, the defendant Amtrak was party to a commercial transportation services contract entitled the "Operating Agreement Between [the MBTA] and [Amtrak]" which provided that, for an "annual fixed price" as well as for separate "Charges for

Additional or Modified Services" and for "Charges for Extra Work" and for separate "Performance Incentive Payments," Amtrak would provide personnel to operate certain aspects of the MBTA Commuter Rail Service. (*See* "Operating Agreement Between [the MBTA] and [Amtrak]," pp.26-31 attached in pertinent part as **Exhibit A - Amtrak**.)

Notwithstanding Amtrak's characterization (at pages 2-3 and 7-9 of Amtrak's Memo.) of the plaintiff's allegations, with respect to the facts of the incident, plaintiff has actually alleged the following:[1]

   1. While on MBTA Train P514 which was crewed by Amtrak personnel, "Dr. Allen began to gasp and make raspy, snore-like sounds drawing the attention of several passengers. Within moments, Dr. Allen slumped sideways with his head and shoulders over the armrest into the aisle. A nearby passenger immediately checked on him while another flagged down an Amtrak assistant conductor. As the assistant conductor arrived, another passenger checked and found Dr. Allen's skin purplish and clammy." (*See* Complaint, p. 2 at ¶ 7, attached to as **Exhibit B** to Plaintiff's Opposition to the Motion for Summary Judgment of the MBTA, hereinafter "the MBTA Motion").

   2. "A fellow passenger with a medical doctor's degree arrived ... asking the Amtrak personnel if 911 had yet been called, [and] at about 8:53 a.m., the doctor immediately began cardiopulmonary resuscitation ... Two Amtrak assistant conductors were present when it was clearly stated that Dr. Allen had no pulse, was not breathing and was, therefore, critically ill." (**Exhibit B**, Complaint, p. 2 at ¶ 8; Deposition of Jeanne E. Hathaway, M.D., pp. 33-34 attached as **Exhibit C** to Plaintiff's Opposition to the MBTA Motion).

   3. "CPR was ongoing when the train pulled into Auburndale station ... at about 8:54 a.m. ... More than one passenger offered to call 911 for the crew, but were told: 'we've got it.' As commuters boarded at Auburndale, the crew decided that the train would proceed to Back Bay located four stations, and nearly twenty minutes, away." (**Exhibit B**, Complaint, p. 2 at ¶ 9; Deposition of James A. Peros, pp. 38-39, attached as

---

   [1] These factual allegations are essentially identical to those submitted by plaintiff in her Statement of Disputed Facts Opposition to the motion for summary judgment filed by the MBTA. To avoid unnecessary duplication, plaintiff incorporates by reference her **Exhibits B-G** attached to that Opposition and only attaches hereto those additional exhibits that apply uniquely to Amtrak's motion. For the sake of continuity, the exhibits attached hereto will follow the same lettering sequence.

**Exhibit D** to Plaintiff's Opposition to the MBTA Motion**;** Witness Statement of Dale H. Boam, p. 3 attached as **Exhibit E** to Plaintiff's Opposition to the MBTA Motion).

4. "Newton-Wellesley Hospital ... is located one mile from the Auburndale station and is about one minute away by ambulance. Newton Fire Station No. 2 is located less than six-tenths of a mile, or about forty-five seconds for an emergency vehicle, from the Auburndale station. Like all ambulances regularly serving NWH ... every Newton Fire Department emergency vehicle contained portable external defibrillation equipment. Between 8:40 a.m. and 9:05 a.m., rescue vehicles and personnel were in quarters ... and were available to respond if called. Despite this, Train P514 departed Auburndale at about 8:56 a.m." (**Exhibit B**, Complaint, p. 2 at ¶ 10).

5. "It was not until the train was stopped at Auburndale that Amtrak's lead conductor arrived at the scene to evaluate the emergency. In fact, through discovery it has since been learned that even though he was aware of the emergency at or before Auburndale, in violation of all safety and emergency regulations including the Emergency Preparedness Plan upon which the MBTA bases its motion, the conductor actually did not show up to evaluate the emergency for himself until much later, either at or shortly before the West Newton Station. (*See* **Exhibit D**, Depo. of J. Peros, pp. 15-20, 39). When challenged by passengers as to why they were not awaiting medical assistance, the conductor inaccurately stated that emergency personnel could not access the station ... As the train departed Auburndale, the crew had still made no attempt to contact emergency medical services or to even report the situation as an emergency ..." (**Exhibit B**, Complaint, pp. 2-3 at ¶ 11).

6. "As Train P514 proceeded on its usual schedule from Auburndale to West Newton, Amtrak's lead conductor was observed casually collecting tickets from seat-backs. It was not until the train slowed for its scheduled stop at West Newton, minutes later, that the engineer reached CSX dispatch in Albany, New York, to advise, incorrectly, that: 'Our conductor's got a passenger who has apparently passed out, he's breathing, but passed out. We need medical attention at Back Bay station.' ... Neither the conductor nor the engineer declared an emergency as provided for under all standard railroad operating rules or under the operating rules of either the MBTA or Amtrak. The train crew made no attempt to make direct, local contact with Amtrak, the MBTA, EMS or 911." (**Exhibit B**, Complaint, p. 3 at ¶ 12).

7. "As Train P514 slowed to a stop at West Newton, another passenger challenged the lead conductor and demanded to know why, if they had to proceed to Back Bay, they were still stopping for passengers instead of going straight through. The conductor responded, 'What about the people on the platform?' and dismissed the passenger, telling him to 'take it up with the T.' Passengers looked on in disbelief as the crew made yet another routine stop to disembark and board commuters. Many on board began yelling at the crew to do something." (**Exhibit B**, Complaint, p. 3 at ¶ 14; Witness

Statement of Kirsten N. Hano, pp. 2-3 attached as **Exhibit F** to Plaintiff's Opposition to the MBTA Motion).

8. "Newton Police Headquarters is located about two hundred yards from the MBTA's West Newton commuter rail station. A portable, Automated External Defibrillator ('AED') was available in or near the Police Station's front lobby. All Newton police vehicles were equipped with AEDs. ... Despite this, Train P514 pulled out of West Newton at 9:00:41 a.m." (**Exhibit B**, Complaint, p. 3 at ¶ 15).

9. "Within about thirty seconds after departing West Newton, a young man trained as an ... EMT ... arrived to assist in providing CPR to Dr. Allen. The young man urgently instructed the crew to call ahead and have paramedics waiting at Newtonville, the next stop, but when the conductor responded that they could not and that it would somehow be faster to have paramedics waiting at Back Bay, the young man told him to make certain they were routed express. None of these instructions were heeded." (**Exhibit B**, Complaint, p. 3 at ¶ 16; **Exhibit E,** Statement of D. Boam, pp. 7-8).

10. "Shortly after the train departed West Newton, another concerned passenger followed a male crew member through a car demanding to know what they were doing and seeking assurances that, if they had to proceed to Back Bay, the train would make no further stops en route. When the conductor asked the passenger why, the man explained in disbelief the seriousness of Dr. Allen's medical situation and that he would die if the crew continued to stop for passengers. The conductor promised that no more stops would be made. The train then made yet another routine stop for passengers at the Newtonville station at 9:02:39 a.m." (**Exhibit B**, Complaint, p. 4 at ¶ 17; Witness Statement of Jennifer L. Houghton, pp. 2-3 attached as **Exhibit G** to Plaintiff's Opposition to the MBTA Motion).

11. "Newton Fire Station No. 4 is located less than one-half mile from the Newtonville station and is staffed with rescue personnel and paramedics who were in quarters at 9:00 a.m. on July 30, 2002. Travel time from the firehouse to the MBTA's Newtonville station is approximately 45 seconds." (**Exhibit B,** Complaint, p. 4 at ¶ 18).

12. "At about 9:15 a.m., Train P514 pulled into Back Bay station. ... James Allen was declared dead at 10:14 a.m." (**Exhibit B,** Complaint, p. 4 at ¶ 19).

13. "At the time of Dr. Allen's collapse and cardiopulmonary resuscitation, it was or should have been clear to the train's crew that Dr. Allen needed emergency medical services, including defibrillation and advanced life support, and that such services were readily available near the three rail stations at which the train stopped immediately after Dr. Allen's collapse. As a result of the gross negligence, recklessness and unfair acts and practices of the defendants, the crew failed to immediately contact emergency services, failed to report the emergency in a timely manner, and failed to

access available emergency services at various stops along the route.  Had the defendants satisfied their duty of care to Dr. Allen, he would have recovered from this incident and resumed his regular activities; instead, the decedent died as a result of the negligence, gross negligence and violations of Mass. Gen. L. c. 93A on the part of the defendants, their employees and agents." (**Exhibit B,** Complaint, p. 4 at ¶ 20).

14. "The defendants [including specifically, Amtrak], their employees and agents were negligent on, and prior to, July 30, 2002 with respect to the operation of the MBTA commuter rail system by, among other things, failing to take reasonable steps in response to Dr. Allen's need for emergency services, failing to have and follow adequate emergency and communications procedures and failing to properly train their personnel." (**Exhibit B,** Complaint, p. 5 at  ¶ 23).

15. "The defendants violated the Massachusetts Consumer Protection Act, Mass. Gen. L. c. 93A, with respect to the operation, control and provision of services on and for the MBTA commuter rail system on, and prior to July 30, 2002, by, among other things, violating safety rules and regulations intended to protect consumers and failing to develop, institute and implement proper emergency medical procedures and preparedness training." (**Exhibit B,** Complaint, p. 6, ¶ 31).

Apart from the factual allegations and support set forth above, facts relating to Amtrak's role in the transportation marketplace in Massachusetts as of June 2002 are highly relevant to Amtrak's motion, if not significantly in dispute.  For example, the Amtrak - MBTA Commuter Rail contract which expired in 2003, was in the top two or three largest commuter service contracts entered into by Amtrak in the nation. (*See* Deposition of Amtrak by Larry R. Beard, Director - Office of Emergency Preparedness, pp. 37-41 attached hereto as **Exhibit H - Amtrak**).

While Amtrak, thus far, has resisted producing certain financial documents which remain subject to ongoing discovery dispute consultations, there are a number of sources in the public domain which underscore the financial and commercial significance of Amtrak's contract with the MBTA.  For example, according to the United Transportation Union (the labor union to which the Amtrak train conductors this case belongs), when Amtrak opted not to renew its contract with the MBTA, Amtrak:

>"end[ed] its most lucrative commuter rail contract in the nation ... handing the tracks and some 1,600 union workers, to one of three [other private] companies positioned to bid on the estimated $150 million-a-year, five year deal."

(*See* "Amtrak Passes on MBTA Contract Renewal," United Transportation Union News, Aug. 2, 2002, at p. 1, attached hereto as **Exhibit I - Amtrak**). The article went on to say that, in 2000, Amtrak was outbid in a competitive bid by another corporation, Bay State Transit, to maintain the MBTA's commuter rail system rails and equipment. (*Id.* at p. 2). It went on to state that Amtrak President, David L. Gunn, had listed 10 new stipulations in the MBTA's new "commuter rail contract that would differ substantially from the contract Amtrak [then held], reaping about $180 million a year." (*Id.* at p. 2). It concluded by noting that one reason Amtrak opted not to renew its contract with the MBTA was that "the new contract would virtually eliminate incentives for on-time performance and fare collection – currently worth $130,000 a month to Amtrak – and replace it with 13 different penalties. (*Id.*). *See also* "Gunn Turns Down MBTA," Freedom Newsletter at p. 1-2 (www.nationalcorridors.org) attached hereto as **Exhibit J - Amtrak**) (same); "Amtrak Pullout A Pioneer Victory," Pioneer Institute for Public Policy, p. 1 (www.pioneerinstitute.org) attached hereto as **Exhibit K - Amtrak)**.

    There is little question that, at the time of Dr. Allen's death, Amtrak's contract with the MBTA was "one of the most lucrative real deals in the country" and was valued at almost $1 billion over a five year span. ("T Rail Choice Seen As Early as Next Week," Boston Globe, Dec. 4, 2002 attached as **Exhibit L - Amtrak**). All such facts are relevant to the disputed issue of whether Amtrak was operating and, if so, to what extent, in the rail transportation marketplace in Massachusetts at the time of the decedent's death.

In sum, the allegations plaintiff actually made – as distinguished from Amtrak's characterization of those allegations – and the evidence that supports such allegations, shows that Amtrak has failed to meet its burden on summary judgment and its motion should be denied.

>Respectfully submitted,
>Plaintiff, Marlene V. Allen, Executrix of the
>Estate of James R. Allen, Ph.D.
>By Her Attorneys,
>
>/s/ Bradley M. Henry
>_____
>Leo V. Boyle, BBO No. 052700
>Michael B. Bogdanow, BBO No. 544174
>Bradley M. Henry, BBO No. 559501
>MEEHAN, BOYLE, BLACK & FITZGERALD, P.C.
>Two Center Plaza, Suite 600
>Boston, MA  02108-1922
>(617) 523-8300

### CERTIFICATE OF SERVICE

I, Bradley M. Henry, hereby certify that on this 15th day of July 2005, I served the foregoing PLAINTIFF'S CONCISE STATEMENT OF DISPUTED FACTS IN OPPOSITION TO THE MOTION OF THE DEFENDANT AMTRAK FOR PARTIAL SUMMARY JUDGMENT, by electronic filing and by mailing an exact copy thereof, via first class mail postage prepaid to all counsel of record:  Michael J. McCormack, Esq. and David T. Mitrou, Esq., McCormack & Epstein, 1 International Place - 7th Floor, Boston, MA 02110; William J. Dailey, Jr., Esq. and Harry A. Pierce, Esq., Sloan and Walsh, Three Center Plaza, Boston, MA 0210; Michael B. Flynn, Esq. and Richard A. Davidson, Jr., Esq., Flynn & Associates, P.C., 400 Crown Colony Drive, Ste. 200, Quincy, MA 02169.

>/s/  Bradley M. Henry
>_____
>Bradley M. Henry