UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NO. 04-CV-12080-PBS

| | |
|---|---|
| MARLENE V. ALLEN, Executrix of the Estate of James R. Allen, Ph.D., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, NATIONAL RAILROAD PASSENGER SERVICE (a/k/a "AMTRAK") and CSX TRANSPORTATION, INC., | ) ) ) ) ) |
| Defendants. | ) ) |

SUPPLEMENTAL MEMORANDUM IN SUPPORT
OF MOTION FOR LEAVE TO FILE AMENDED ANSWER AND CROSSCLAIM

The defendant and proposed plaintiff-in-crossclaim, MBTA, files this supplemental memorandum with respect to the issue of arbitration, an issue first raised in Amtrak's Motion for Extension of Time to Respond to Motions to Vacate Judgment and Amend Answer.

As the Court is aware, the MBTA contracted with Amtrak, the largest commuter rail operator in the country, for Amtrak to supply employees to run the commuter railroad service offered by the MBTA. The events in issue concern the acts and omissions of Amtrak employees during a medical emergency. Moreover, Amtrak, as the responsible operator, had no policies or procedures for its employees to follow in a medical emergency.

Throughout these proceedings, and before, the MBTA has maintained that the potential liability associated with the Allen claim, if any, resulted from egregious conduct on the part of Amtrak and its employees. Notwithstanding, in order to discharge its obligation under section 15(a) of the Operating Agreement (at page 44) to indemnify Amtrak against Amtrak's own

negligence, MBTA (at a cost of about $300,000) has defended itself and Amtrak, settled the case, and obtained a release from the plaintiff in favor of Amtrak by the payment of $3.9 million.

During the pre-lawsuit negotiations with plaintiff's counsel, and during the lawsuit, the MBTA repeatedly demanded that Amtrak should enter into discussions concerning whether or not the tortuous conduct of the Amtrak employees rose to the level of "excluded conduct" under section 15(d), thus reversing the indemnity obligation, but Amtrak rebuffed all the MBTA's efforts to work towards a tripartite resolution. See correspondence in Exhibit 2, attached hereto.

In its September 30, 2005 request for additional time to oppose the MBTA motions, Amtrak twice states this dispute should be arbitrated. Arbitration is waived.

When the crossclaim was circulated to counsel under Local Rule 7.1 in June 2005, Amtrak objected and threatened that it would disqualify its defense counsel for conflict of interest.[1] The MBTA withdrew the motion until such time as the plaintiff's case was resolved. Amtrak knew at all times the MBTA would pursue the "excluded conduct" issue. It is frivolous to suggest otherwise. During all this time Amtrak never once proposed or demanded arbitration, even when the MBTA suggested it as a possibility. Arbitration, like the conflict of interest issue, see n. 1, is long since waived.

In any event, a review of the Operating Agreement provisions concerning arbitration and a review of the law make it clear that the present controversy is appropriately in court and not in arbitration. Two provisions of the Operating Agreement are particularly central: Section 15

---

[1] Counsel for Amtrak (who for an extended period pre-suit represented both the MBTA and Amtrak with Amtrak's acquiescence) was experienced, capable, knowledgeable of the case and well prepared. Despite having waived the issue that had long concerned the MBTA, conflict of interest, Amtrak, its stonewalling running out, cynically resorted to it when it was in its interest to do so. As the correspondence in Exhibit 2 shows, Amtrak not only refused to participate in any settlement talks but it repeatedly refused the MBTA's importuning to retain its own lawyer to avoid the conflict of which it eventually complained in June, even though the MBTA offered to choose another counsel for Amtrak or have Amtrak choose another counsel, in either event at MBTA's expense. In sum the record shows that MBTA never shied away from its putative obligation to indemnity Amtrak, but that Amtrak "stonewalled" all efforts at resolving the indemnity issue.

("Indemnification and Liability"); and Section 19 ("Dispute Resolution"). The MBTA contends these provisions may be read, in harmony and without ambiguity, as mandating the present controversy belongs in court and not in arbitration.   Apart from any illusory "exhaustion" argument, any effort by Amtrak to find an agreement to arbitrate the issue of "excluded conduct" fails to survive scrutiny under the canons of construction and necessarily requires the "balkanization" of a sui generis phrase in the Operating Agreement.

## I.    Pertinent Provisions of the Operating Agreement

(a)    Section 19 – Dispute Resolution

Section 19 (a) of the Operating Agreement (pages 54-59) calls for reasonable efforts to settle "any dispute concerning the interpretation, application or enforcement of this Agreement" and for 60 day notice of "any claim for compensation or other dispute arising under this Agreement." Section 19(b)(1) provides for informal dispute resolution.

Section 19(b)(2) provides that, if the dispute is unresolved by the parties' CEO's, it:

(A)    **may be submitted by either party in writing to arbitration under subsection (c) if the dispute involves $500,000 or less…**; or

(B)    **may be brought before the United States District Court in Boston, Massachusetts, if the issue in dispute involves more than $500,000…**[2]

[C]    **Disputes between the MBTA and Amtrak over the amount in controversy in a dispute shall be resolved pursuant to arbitration**….[3]

---

[2] Section 19(b)(2) provides additionally that if the dispute concerns the liability of either the MBTA or Amtrak for personal injury or property damage, the amount used for determining the appropriate forum shall be $1,000,000.

[3] Section 19(c)(2) provides in addition: "If the issue in the arbitration is the amount in controversy in the dispute, the arbitration panel shall initially consider only that issue …[and t]he decision of the arbitration panel on the amount in dispute shall be controlling for purpose of determining the appropriate forum under subsection (b)(2)…."

Finally, section 19(c)(3) provides "the arbitration shall be conducted in accordance with Chapter 251 of the Massachusetts General Laws.

(b)    Sections Referring to Section 19

Section 19 is referred to in a total of five substantive provisions in the agreement:

1.    Section 3(h) provides that disputes concerning ***dispatching of trains or services*** "***shall*** be resolved in accordance with Section 19…" (p. 12)

2.    Section 7(g)(6) provides that, as concerns a ***disputed invoice or payment*** "either party ***may*** submit the matter to dispute resolution under Section 19…" (p. 32)

3.    Section 7(h)(3) provides that "disputes in connection with the ***audit or inspection of invoices*** or records ***may*** be submitted by either party for resolution in accordance with Section 19…" (p. 34)

4.    Section 15(d) provides Amtrak will be the indemnitor instead of the indemnitee "***if*** it is determined pursuant to arbitration as provided in Section 19 of this Agreement that such liability arose as a result of Excluded Conduct…" (p. 45)

5.    Section 15(f)(3)(E), concerning FELA liability provides "Notwithstanding the monetary limitation on the value of claims subject to arbitration specified in Section 19 of this Agreement, the parties ***specifically agree*** that any dispute concerning the implementation of this subsection or the report of the actuary ***shall*** be subject to private arbitration as provided in Section 19. (p.51)

## II    The Law of Arbitration

(a)    There Must Be an Agreement

The law of arbitration is reasonably well established.  Before there can be any arbitration ordered it must be determined if the parties have agreed to arbitrate the particular dispute in issue and the courts ordinarily look to state law of contracts to determine whether the parties have agreed to arbitrate a certain claim. *Deluca v. Bear Stearns & Co.*, 175 F. Supp.2d 102, 107 (D. Mass. 2001).  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

In this case, the Operating Agreement calls for the Massachusetts Arbitration Act, M.G.L. c. 251, a statute that substantially adopts the Uniform Arbitration Act and closely tracks the Federal Arbitration Act, 9 U.S.C. § 2. See *Brennan v. King*, 139 F.3d 258, 266-267 (1st Cir. 1998).

The law is materially indistinguishable whether state or federal:

Arbitration results from a contractual agreement of the parties and arbitration of an issue cannot be imposed on a party who has not agreed that that issue be so adjudicated. … Whether given parties have agreed to arbitrate a particular issue is a matter of contract interpretation and this is normally for the court to decide.

*Massachusetts Correction Officers Federated Union v. Sheriff of Bristol County*, 55 Mass. 285, 287-288 (2002) citing *Local No. 1710 v. City of Chicopee*, 430 Mass. 417, 420-21 (1999). Accord, *Intergen N.V. v. Grina*, 344 F.3d 134, 142-143 (1st Cir. 2003), *McCarthy v. Azure*, 22 F.3d 351, 354 (1st Cir. 1994).

Stated another way: "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.". *Raytheon Co. v. Donovan*, 208 F. Supp.2d 99, 103-104 (D. Mass. 2002). "[C]ourts cannot override the intent of the parties by compelling them to arbitrate where they have not agreed to do so." *Danieli & C. Officine Meccaniche v. Morgan Construction Co.*, 190 F. Supp.2d 148, 154 (D. Mass. 2002) citing *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002) and *Local 285 SEIU v. Nonotuck Resource Associates, Inc.*, 64 F.3d 735, 738 (1st Cir. 1995).   "[T]he federal policy favoring arbitration[4]is not a free-standing

---

[4] "… In construing arbitration clauses, [courts] proceed on the basis of a presumption of arbitrability in the sense that an order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *Massachusetts Correction Officers Federated Union v. Sheriff of Bristol County*, 55 Mass. at 287-288 citing *Local No. 1710 v. City of Chicopee*, 430 Mass. 417, 420-21 (1999). *Intergen N.V. v. Grina*, 344 F.3d at 142-143, *McCarthy v. Azure*, 22 F.3d at 354.

ground upon which to remit parties to arbitration, but one that informs the court's interpretation."

*Brennan v. King*, 139 F.3d 258, 266 (1st Cir. 1998).

> The purpose of the FAA is "to make arbitration agreements as enforceable as other contracts, not more so." *Prima Paint Corp. v. Flood & Conflin Mfg. Co*, 388 U.S. 395, 404 n. 12 (1967). It follows inexorably from that statement that the principle of resolving doubts in favor of arbitration is 'subject to constraints." *Coady v. Ashcraft &* Gerel, 223 F.3d 1, 9 (1st Cir. 2000). One important constraint is that federal policy favoring arbitration does not totally displace ordinary rules of contract interpretation.

*Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 25 (1st Cir. 2000).

    (b)   <u>Canons of Construction</u>

The judicial task is to determine the parties' intent and where, as here, the language of the agreement is clear and unambiguous, it is the primary guide to the parties' intentions. *McCarthy,* 22 F.3d at 355. Arbitrability "is ordinarily a function of the parties' intent as expressed in the language of the contract document" and the "words of a contract, if clear, must govern its interpretation." Id. at 358. *Massachusetts Municipal Wholesale Elec. Co. v. City of Springfield*, 49 Mass. App. Ct. 108, 111 (2000).

> Ambiguity is not created by a mere allegation.

> If a contract provision is entirely unambiguous, there can be no question of construction …. The mere assertion that a question has arisen does not create one where it is plain on the face of the agreement that none can exist.

*Local No. 1509 v. Eastern Mass. Street Railway Co., 162 F. Supp. 942, 944 (D. Mass. 1958).*[5]

"A term is ambigious only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one," *Bercume v. Bercume*, 428 Mass. 635, 641 (1999) quoting *Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381 (1998), or where its terms are "inconsistent on their face or where the phraseology can support reasonable

---

[5] Although there are generic similarities between labor and employment arbitration on the one hand and commercial arbitration on the other, the latter is more likely to have a narrowly tailored arbitration clause. *McCarthy v. Azure*, 22 F.3d 351, 358 (1994). See also *Local No. 1710 v. City of Chicopee*, 430 Mass. 417, 423-424 (1999) (arbitration clause cannot be called broad where it contained words of limitation).

difference of opinion..." *Suffolk Constr. Co., Inc. v. Lanco Scaffolding, Inc.*, 47 Mass. App. Ct. 726, 729 (1999)

Federal law is the same, "guided by 'common-sense canons of contract interpretation.' [including the] canon ... that contracts containing unambiguous language must be construed according to their plain and natural meaning." *Smart v. Gillette Company Long-Term Disability Plan*, 70 F.3d 173, 178 (1st Cir. 1995) citing *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir. 1989).

> There is nothing ambiguous in the language of the Operating Agreement.

> Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.

*Smart*, 70 F.3d at 178 citing *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989).

> Justice Breyer states an ambiguity must be palpable and not illusory:

> [G]iven the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why the courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge and not an arbitrator, would decide.

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. at 945.[6]

(c)     What Does the Agreement Say About Dispute Resolution?

Section 19 (b) (2) in essence, calls for disputes under $500,000 to be arbitrated and disputes over $500,000 to be litigated in federal court.

---

[6] "If it is not 'reasonably debatable' whether the ... dispute is within the scope of the arbitration clause, to force a party to 'arbitrate first' would directly contradict the rule that parties must be protected from unauthorized arbitration." *Minnesota Teamsters v. County of St. Louis*, 611 N.W.2d 355, 360 (Minn. App. 2000).

It adds "if the dispute concerns the liability of either the MBTA or Amtrak for personal injury or property damage, the amount used for determining the appropriate forum shall be $1,000,000. Finally, section (b)(2) provides: "Disputes between the MBTA and Amtrak over the amount in controversy in a dispute shall be resolved by arbitration under subsection (c)."[7]

A fair description of the subsection is that it is a forum selection clause in that it unmistakably calls for arbitrating any non-tort dispute under $500,000 and any tort dispute under $1,000,000.  There is nothing ambiguous about this.[8]

> (d)    The Parties Were Specific When Discussing Arbitration

When they did refer to arbitration, the parties were very specific. The language of the agreement shows that when the parties agreed that something in particular should go to arbitration, they clearly said so; for example a dispute over "the amount used for determining the appropriate forum" "shall be resolved by arbitration."

The level of detail is further evidenced where the parties have calibrated four distinctly different routes to arbitration depending on the substantive issue involved. The parties:

(1)    **"specifically agree[d]"** to arbitrate FELA cases (Agreement page 50);

(2)    provided that dispatching, FELA and amount-in-controversy issues **"shall"** be arbitrated (pages 12, 51, 55);

(3)    provided that audit issues or any issues under $500,000 **"may"** be arbitrated (pages 34, 55);

(4)    provided that "[n]otwithstanding any other provision of [section 15], "**if** it is determined pursuant to arbitration as provided in Section 19 … that such liability arose as a

---

[7] Assuming this clause, the only clause in the dispute resolution section that requires arbitration irrespective of the amount in controversy, otherwise might apply here, there is no dispute over the amount in controversy nor could there be any such dispute as the amount in controversy is the liquidated sum of $4.2 million.

[8] Amtrak will apparently argue that section 15's "excluded conduct" must be arbitrated irrespective of the amount in controversy in section 19. The Agreement neither states nor implies this.

result of Excluded Conduct of the Other Party, the Other Party shall indemnify [the party]."
(page 45).

Nowhere is there any express provision that the parties "specifically agreed" to submit
the issue of indemnity to arbitration, or that indemnity "shall" be arbitrated, or even that it "may"
be arbitrated. Nowhere is there any language that expressly says the issue of "excluded conduct"
"shall" be arbitrated, or that the parties "specifically agree" it shall be arbitrated,, or that it "may"
be arbitrated. Only "if" it is arbitrated.

Even where arbitration of a dispute concerning the amount in controversy is provided for
in section 19 (b)(2), it is qualified in section 19 (c)(2), which provides "the arbitration panel shall
initially consider only that issue [which] shall be controlling for purpose of determining the
appropriate forum…."

Further, section 19 (c)(4) provides that "[e]xcept with respect to an arbitration over the
amount in controversy under paragraph (2), the parties to an arbitration under this subsection
shall submit their last offer or position in the dispute to the arbitration panel [which shall adopt
either the last offer or position of the MBTA or of Amtrak…."

The only connection between arbitration and indemnity (other than the "amount in
controversy" clause) is the phrase in section 15 (d) -- "if" the issue of excluded conduct is
arbitrated. Section 15(d) implies that excluded conduct might or might not be arbitrated.[9]

(e)     Arbitration Of Some Issues And Not Others Is Well Known To The Courts

---

[9] Amtrak's view that excluded conduct must always be arbitrated both reads something into the Agreement that is
not there and renders meaningless the monetary threshold in section 19 (b)(2). See *Willitts v. Roman Catholic
Archbishop of Boston*, 411 Mass. 202, 208-209 (1991).

The "proper function of the court is to determine whether parties agreed to arbitrate [a] **particular** dispute." *Local No. 1710*, 430 Mass. at 425 citing *School Comm. of Southbridge v. Brown*, 375 Mass. 502, 504 (1978) (emphasis in original).

"Parties to collective bargaining agreements are bound to arbitrate only disputes within the scope of the arbitration clause." *Coffey v. County of Plymouth*, 49 Mass. App. Ct. 193, 195 (2000). "A scope question arises 'when the parties have a contract that provides for arbitration of some issues' and it is unclear whether a specific dispute falls within that contract." *Deluca*, 175 F. Supp.2d at 117 citing *Paul Revere Variable Annuity Ins. Co.*, 226 F.3d at 25. See also *First Options*, 514 U.S. at 943 (if parties did not agree to submit particular dispute to arbitration the court must decide it independently because "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration.")

Moreover, where an agreement clearly provides for mandatory arbitration on one issue and not another, the act of distinguishing sheds light on the intent of the parties and the rule of contract construction known as *expressio unius est exclusio alterius* applies. *Digital Equipment Corp. v. Altavista Technology, Inc.*, 960 F. Supp. 456, 473 (D. Mass. 1997) citing *FDIC v. Singh*, 977 F.2d 18, 22 (1st Cir. 1992) and *Chatham Pharmaceuticals, Inc. v. Angier Chemical Co.*, 347 Mass. 208, 211 (1964). See also *Smart*, 70 F.3d at 179.

Accordingly:

the use of significantly different language in two clauses, sculpted by the same parties during the same negotiations as part of the same overall transaction, strongly suggests that the signatories intended the arbitration provisions to be of different scope.

*McCarthy*, 22 F.3d at 358.

(f)     The clause "if it is determined pursuant to arbitration
[there was] Excluded Conduct" does not supercede <u>the</u>
<u>Agreement's dispute resolution provisions as a whole</u>

"The intent of the parties must be gathered from a fair construction of the contract as a whole and **not by special emphasis on any one part**." *Ucello v. Cosentino*, 354 Mass. 48, 51 (1968) (emphasis added).

"Accepted canons of construction forbid the balkanization of contracts for interpretive purposes." *Smart*, 70 F.3d at 179 citing *Fashion House, Inc.*, 892 F.2d at 1084 (examining agreement as a whole to interpret one part) and Restatement (Second) of Contracts § 202 comment d (1981) (explaining that "where the whole can be read to give significance to each part, that reading is preferred.").

Although "a document should be read to give effect to all its provisions and to render them consistent with one another," *Raytheon Co.*, 208 F. Supp.2d at 106, quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995), and "each term is to be given meaning where possible," *Gillentine v. McKeand,* 426 F.2d 717, 722 (1st Cir. 1970), *Willitts v. Roman Catholic Archbishop of Boston*, 411 Mass. 202, 208-209 (1991),

> An interpretation which gives a reasonable meaning to all of the provisions of a contract is to be preferred to one which leaves a part useless or inexplicable.

*Siegel v. Berkshire Life Ins. Co.*, 51 Mass. App. Ct. 744, 749 (2001) citing *Sherman v. Employers' Liab. Assurance Corp.*, 343 Mass. 354, 357 (1961) and *Worcester Mut. Ins. Co. v. Marnell*, 398 Mass. 240, 245 (1986).

> [I]t is a familiar principle that "a construction that comports with the Agreement as a whole is to be preferred even if it be thought that certain language, viewed only by itself, more readily suggests something else."

*Taunton Municipal Lighting Plant v. Quincy Oil, Inc.*, 503 F. Supp. 235, 237 (D. Mass. 1980) quoting *Spartans Industries, Inc. v. John Pilling Shoe Co.*, 385 F.2d 495 (1st Cir. 1967).

*Taunton Municipal Lighting* found a binding contract despite "some variable terms left in the unilateral discretion of the parties." Id. In a similar case, *McCarthy v. Tobin*, 44 Mass. App. Ct. 274, 278-279 (1998), there were no ambiguous terms but there were two self-contradictory clauses (one that looked to the execution of a formal offer to purchase and one stating this document is a binding document that creates legal obligations); the court held "while it is not entirely clear what the drafter (identity unknown) had in mind by the insertion of [the former], that obscurity is not decisive in this case. … [W]e hold the parties to the conclusion that reasonably intelligent persons would reach in the circumstances."

In sum, the forum selection formula should not be trumped by the isolated, stand-alone phrase "if" something is arbitrated. "[W]here, as here, the parties are sophisticated business entities who, represented by attorneys, freely entered into a contract, it is not appropriate for a court to rewrite their agreement." *Davis v. Dawson, Inc.*, 15 F. Supp.2d 64, 107 (D. Mass. 1998). The agreement clearly calls for disputes such as the present one, over $1 million, to be taken to court.

### III.    There Was No Failure to Exhaust Remedies

To the extent Amtrak argues the MBTA failed to properly exhaust any alleged requirements or conditions of the Operating Agreement, any such argument has no legal or factual support. The written record unmistakably shows that the MBTA tried repeatedly to get the attention of Amtrak on the issues of excluded conduct and indemnity, and even broached the possibility of arbitration, all to no avail, as Amtrak completely scorned any participation, essentially taking the position there could not possibly be any "excluded conduct." See n. 1. The

correspondence is attached hereto as Exhibit 2 to Motion For Leave to File Amended Answer and Crossclaim. If there was any need to exhaust contract remedies, and it is not clear that there was, it surely has been complied with as a matter of common sense.

IV.    Conclusion

For the above reasons, as well as the reasons previously expressed in its Motion for Leave to File Amended Answer and Crossclaim, the defendant MBTA respectfully asks the Court to permit its dispute with Amtrak over indemnity to be litigated in this proceeding before this Court.

Defendant, Massachusetts
Bay Transportation Authority
By its attorneys,


/s/ Harry A. Pierce_____
William J. Dailey, Jr., BBO No. 112200
Harry A. Pierce, BBO No. 399275
Sloane & Walsh, LLP
Three Center Plaza
Boston, MA  02108
(617) 523-6010

DATED: October 20, 2005

S:\ALLEN, ESTATE OF JAMES V. MBTA, ET AL - MB105-8087\Pleadings\Trial\Supp Memo in Supp Mot to Amend Ans.doc